# FRANK H. CALLAWAY *vs.* JOHN HUBNER, Trustee,
## ET AL.

*Trustee's Sale—Failure to Exercise Due Diligence to Obtain the Best Price.*

Certain trustees who were managing the trust estate under the direction of a Court of equity owned a tract of land which was traversed by a deep ravine and which was well adapted for use as a site for a reservoir. The officials of Baltimore City were contemplating the construction of a new reservcir when this site was proposed to the water board by one C. who informed the trustees of what he had done. In April, 1902, the Legislature passed an Act authorizing the city to issue a loan for the purpose of building a new reservoir. In May, 1902, the trustees sold land near the site in question at auction for $700 per acre. In November, 1902, the trustees gave to C. an option to purchase 92 acres, including the said reservoir site, for $700 per acre, the option to be exercised within six months. The equity Court passed an *ex parte* order authorizing the option so given. The owners of twenty-two acres adjoining this property empowered C., as their agent, to sell their land to the city for $2,000 per acre. In May, 1903, C. offered to sell to the city for a reservoir site the said 92 acres in his own right and the twenty-two acres adjoining, as the agent of the owners, all for the sum of $2,000 per acre. This offer was accepted by the municipal authorities. In June, 1903, C. accepted the above-mentioned option given to him by the trustees. Afterwards the trustees reported to the Court the sale to C. of the ninety-two acres at $700 per acre. Upon exception to the sale by parties in interest. *Held,* that the trustees had not exercised due diligence and discretion to obtain the best price to be had for the property, since they made no effort to sell directly to the city although they knew that the city was seeking a reservoir site, but disregarding the peculiar availability of the property for such use, they treated it as unimproved land cut by deep ravines and gave to C. the opportunity of making a sale to the city without incurring any liability if he did not effect the same, and that therefore the exceptions to the sale by the trustees to C. should be sustained and the sale set aside.

*Held.* further, that the trustees cannot be required to report the sale as made to the city through C. as their agent for $2,000 per acre, because the city is a not a party to the proceedings and C. in making the sale acted in his own right and not as agent of the trustees, and the city cannot be compelled to accept the position of a purchaser from the trustees.

Appeal from the Circuit Court of Baltimore City (SHARP, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Edgar H. Gans* and *Vernon Cook*, for the appellant.

*Chas. H. Stanley* and *Frank Gosnell* (with whom were *Randolph Barton, George R. Willis, Allan McLane* and *Henry H. Hubner* on the brief), for the appellees.

PEARCE, J., delivered the opinion of the Court.

This record brings up exceptions to the ratification of a sale made by trustees under somewhat peculiar circumstances. The late Mrs. Frances E. Slingluff by her will and codicil thereto devised to her two sons, Fielder C. Slingluff and Frank Slingluff, two tracts of land in Baltimore County, known as "Beech Hill" and "Forest Farm," in trust to sell, lease, manage, and develop the same as in their judgment should seem for the best interests of the estate, the proceeds to be equally divided between her seven children. This will was probated May 13th, 1890, and on September 22nd, 1890, the Circuit Court of Baltimore City, upon petition of the trustees, assumed jurisdiction of the trust. The trustees borrowed considerable sums of money to develop the estate, and appear to have acted in this respect with sound discretion. From time to time, they sold considerable portions of the property so developed, the last sales having been made in May, 1902, when the tract now in question, embracing 92.8-10 acres, was excluded from the sale and advertisement, having in November, 1901, been offered by the appellant, as agent of the trustees, to the Water Board of Baltimore City, as an exceptionally desirable site for a high-service reservoir which was then contemplated by the board, subject to the passage of an enabling Act. That Act was passed and approved April 8th, 1902, and shortly thereafter an ordinance providing for the issue of stock to carry out the plan was passed by the Mayor and City Council, and was ratified by the people. On December 6th, 1902, the or-

dinance of estimates for 1903 was passed, appropriating
$350,000 for the purchase or acquisition of land for a new res-
ervoir and the cost of construction, and this was approved by
the Mayor December 8th, 1902. On November 20th, 1902,
Geo. R. Vickers, trustee, authorized the appellant to offer
twelve acres of land adjoining the 92.8-10 acres, at $2,000 per
acre for a reservoir site, and on the very day of the approval
of the appropriation of $350,000, December 8th, 1902, the
North Avenue Land Company authorized the appellant to sell,
for the same purpose, 10 acres of adjoining land at $2,000
per acre. On December 21st, 1902, the trustees filed a peti-
tion stating they had an offer from the appellant, F. H. Calla-
way, of $700 per acre for about 92 acres of Forrest Farm,
provided they could give him a six month's option thereon;
that these 92 acres were the least valuable part of the tract,
being very low, and traversed by large ravines, and so situated
that it could not be easily developed; that they had been sell-
ing other portions of this tract on open streets and electric car
lines, at about the same rate per acre as offered for this, and
they believed such sale would be most advantageous, and they
therefore prayed an order to grant such option. An order
was accordingly passed on the same day, and on the follow-
ing day the option was granted, to extend for six months from
date, it being expressly stated therein that the land was re-
quired for the construction of a city reservoir; that unless the
option was exercised within six months it should be void, and
that in order to be availed of, the purchase-money must be
paid in cash, or properly secured before the expiration of the
option. It was admitted that no consideration was given
for this option. On June 10th, 1903, Callaway accepted
this option upon the terms and conditions stated therein. Be-
fore such acceptance however, he had on May 15th, 1903, in
consideration of one dollar, given to the Mayor and City
Council an option upon these 92.8-10 acres, together with the
12 and 10 acre adjoining tracts before mentioned, at $2,000
per acre for each of said three tracts, for a reservoir site, and
this option was ratified by the trustees of the Slingluff estate

and by said Vickers, trustee, and said North Avenue Land Company. On the following day, May 16th, 1903, the Mayor and City Council accepted said option, the purchase-money to be paid in cash within sixty days from date. It is to be observed that in granting this option Mr. Callaway acted as agent for Vickers, and for the North Avenue Land Company, but undartook to act in his own right as to the 92.8-10 acres, though he did not accept the Slingluff option until nearly a month afterwards.

On June 25th, 1903, the trustees reported the granting and acceptance of their option to Mr. Callaway, both of which were filed with said report, together with copies of his option to the Mayor and City Council, and their acceptance, and the trustees prayed for such order thereon as the Court deemed proper. Upon this report the usual order *nisi* was passed.

Before the granting of the option by the trustees to Mr. Callaway, the trustees and Horace Slingluff, three of the seven parties interested in the trust estate, had met with pecuniary reverses, and had been adjudicated bankrupts, and their respective trustees in bankruptcy filed exceptions to the ratification of the sale to Mr. Callaway, upon the following grounds among others: 1st. Because of inadequacy of price; 2nd, because no proper effort was made by the trustees to sell to the best advantage; 3rd, because the petition for authority to grant the option to Mr. Callaway did not properly describe the land, nor fully and fairly inform the Court as to the existing situation and especially as to Callaway's purpose to re-sell to the city for a reservoir site; 4th, because the said petition represented the conformation of the land as a defect depreciating its value, whereas it was this very conformation which gave it exceptional value as a reservoir site, and value superior to that of any of the other six tracts offered for that purpose, the trustees being then informed of Callaway's purpose to re-sell to the city for a reservoir site; and fifth, because the order to grant the option was passed upon an *ex parte* petition, which petition and order were immediately upon the passage of the order withdrawn from the files of the Court, and were not dis-

closed by any docket entry nor otherwise brought to the knowledge of the exceptants until shortly before the report of sale was filed, it being admitted that the averments of the last ground of objection are correctly stated.

Charles H. Stanley and Charles S. Hayden, trustees of Trueman C. Slingluff, and of his children as remaindermen, also filed similar exceptions, so that it is seen that four out of the seven persons interested in the property, occupy the position of exceptants. It was contended in the Court below, and also in this Court, that the trustees should be required to report the sale as made to the city of Baltimore, through Callaway, as their agent, at and for two thousand dollars per acre, and that the sale so reported should be ratified, and this contention will be first considered.

If this result could be reached upon the testimony in the case, and in accordance with sound practice, it would, in our opinion, work substantial justice to the present parties, but there are insuperable objections to this course of action. The Mayor and City Council are not parties to these proceedings; and even if they could be properly made parties, there could be no assurance that they could be required to accept the position of purchaser from one with whom they have not dealt directly. Moreover we have judicial knowledge from the case of *Callaway* v. *The Mayor and City Council,* decided in this Court April 12th, 1904, that the city denies, and is contesting, the validity of the acceptance by the Mayor and Comptroller of the option given by Callaway and we cannot venture to assume today the ratification of a sale, which tomorrow we may be required to declare void. Finally, the evidence in this case does not sustain the contention that the appellant, in his negotiations with the city, acted as agent for the trustees of the Slingluff estate. The proof is clear there was no agreement, express or implied, that the trust estate should have any part of his profits, or should bear any part of the expense incurred by him in effecting a sale to the city, and the proof is equally clear that in all he did he acted entirely in his own behalf. The sale as now reported, must therefore either stand or fall.

Nor do we discover any evidence tending in the slightest degree to impeach the integrity and good faith of the trustees in making this sale. There is no room for suspicion that they had any interest, direct or indirect in the enormous profits which Mr. Callaway will reap if this sale be confirmed, or that they were actuated by any other consideration than the pur-pose to fulfill what they regard as a binding obligation upon them.

We agree with the Circuit Court that the only issue is whether the trustees, under all the circumstances of the case, as disclosed to them, or as open to reasonable investigation, exercised due diligence and discretion in their efforts to obtain a fair and full price, and whether the conduct of Mr. Callaway in the transaction, has been such as to entitle him to the consideration accorded on grounds of public policy, to purchasers from trustees in equity.

The rules by which the duty and discretion of trustees is governed in making sales of property, have been plainly and frequently declared by this Court. In *Gould* v. *Chappell*, 42 Md. 466, it was said: "It is their duty in making a sale of property to act in a *prudent and business like manner*, with a view to obtain as large a price as might, with due diligence and attention, be fairly and reasonably obtainable under the circumstances. In other words, to exercise that diligence and caution which a careful and prudent owner would observe in the sale of his own property. If the sale be made under circumstances of haste and imprudence, or if the trustees fail in reasonable diligence in inviting competition, or adopt an injudicious or disadvantageous mode of selling the property, a Court of equity ought not to ratify the sale. * * * And if they fail to exercise that caution and prudence which may fairly and reasonably be expected from a provident owner in regard to the sale of his own property, and in consequence thereof, the property is sold at a depreciated price, a Court of equity will not sanction such a sale, even though the conduct of the trustee be untainted with fraud, and the purchaser be without fault."

In *Carroll* v. *Hutton*, 88 Md. 681, the Court said if the trustees failed to use due diligence and discretion, "and the property has been sold to the mortgagee at a price about which there is a doubt as to its adequacy (as seems to be the case here) the Court will apply a strict construction to the rules and refuse to ratify the sale."

In 17 Wendell, 669, *Matter of Furman Street*, in determining the standard of compensation to the owner of land, the Court said: "The proper inquiry was 'What is the value of the property for the *most advantageous use to which it may be applied?*'" In *Young* v. *Harrison*, 17 Ga. 30, where land was required for a bridge abutment, it was held "its value was not to be restricted to its agricultural or productive capacities, but that *inquiry should be made* as to all purposes to which it could be applied having reference to existing and prospective wants of the community."

And in *Boon Co.* v. *Patterson*, 98 U. S. 408, the Supreme Court said: "Exceptional circumstances will modify the most carefully guarded rule, but as a general thing, we should say that the compensation to the owner, is to be estimated by reference to the uses for which the property is suitable, having regard to the existing business or wants of the community, or such as may be reasonably expected in the immediate future. * * * and that the adaptability of the land in question was a circumstance therefore which the owner had a right to insist upon as an element in estimating the value of his land," and if this was an element of value upon which the owner had a *right* to insist, it is equally an element which the trustees in the present case were *bound* in the exercise of due diligence and discretion, to take into consideration.

Applying these principles to the case before us, after a thorough examination of the record, we cannot escape the conclusion that the trustees have not fully apprehended the scope of their duties, and have not exercised the degree of care incumbent upon them, in granting the option to Mr. Callaway which if upheld, will enable him, at the expense of the trust estate, to turn over his option without the payment of one cent to the trust estate, at a profit of more than 200 per cent.

In reviewing the testimony we cannot do better than adopt the succinct statement of the learned Judge of the Circuit Court in his opinion contained in the record. "In 1901, the trustees knew the land was available for a reservoir. Mr. Callaway told them that he had offered it to the Water Board. In April, 1902, an enabling Act was passed by the Legislature. In May, 1902, the trustees had a public auction of a number of lots belonging to the same tract. These lots were binding on macadamized roads, with city water, near two electric railroads. The sale was fully advertised; the trustees sold lots, several at about $700 per acre. The remaining lots were withdrawn for want of bidders. In November 1902, when the parol agreement with Mr. Callaway was made, the trustees knew that the city was in the market for a reservoir site, and knew Mr. Callaway had called the attention of the city officers to their land, and knew an enabling Act had been passed by the Legislature, and was soon to be voted on by the people. Under those circumstances they gave Mr. Callaway an option to purchase the land at $700 an acre. If the agreement with Mr. Callaway had been a positive sale at $700 an acre, a different case would be presented. Such a *sale*, in view of the auction, the chances of an adverse vote by the people, or the possible choice of some other location by the city, *might* have been a wise action. They would have been assured of a good price and the purchaser take all the risks. But the trustees did not make such a contract; they gave Mr. Callaway the chance of whatever profit there might be, and took all the risks referred to themselves (including his rejection of the option). They made no investigations or attempt to sell the land directly to the city, although they knew it was in the market for a reservoir site in that locality; they appeared to look on the sale entirely as a sale of unimproved land, rough, and covered with underbrush and trees, a deep ravine extending across it, comparatively remote from electric railroads and city water, leaving out of sight entirely the fact that they owned a valuable (reservoir) site. Such reservoir sites are limited in number, and while it is true there is only one pur-

chaser, yet such sites have a peculiar value, and are quite different things from unimproved lands.   Had the city proceeded by condemnation (as it might have done) the peculiar value of this land as a reservoir site would have been a fact to be considered by the jury in assessing its value."

It is no sufficient answer to this lucid statement of the situation to say, as the appellant says, that the Slingluff tract of 92 acres was not available for a reservoir site without the addition of the Vickers tract of 12 acres and the North Avenue Land Company's tract of 10 acres.   An examination of the map at the end of the record, which will be reproduced in this

opinion, will show that while the addition of these tracts would
enlarge the capacity of the contemplated reservoir, and reduce
the amount of artificial embankment required, they are not
essential to the construction of an adequate reservoir.   They
are mere adjuncts to the principal tract, highly desirable but
not indispensable as additions, and could be added by the
city, either by purchase as Mr. Callaway did, or by condem-
tion if sale could not be effected.   It was earnestly argued for
the appellant that the Slingluff tract had no practical value as
a reservoir site when the trustees gave the option to Mr. Cal-
laway, and that all its value for that purpose was created
through the scheme subsequently developed by him; in other
words, that this value was a subsequent appreciation, to which
a purchaser is always held entitled, just as he is compelled to
bear a subequent incidental depreciation in value.   But the
facts cannot be reconciled with this theory.   As much as a
year before this option was given, Mr. Callaway knew of the
adaptability of the Slingluff tract for a reservoir site and offered
it for that purpose to the city authorities in behalf of these
trustees, to whom he afterwards communicated this action.
Moreover, the scheme was not developed subsequently to the
securing of the option from the trustees, for he procured from
Mr. Vickers on *November 20th*, the authority to offer the 12-
acre tract to the city, the day before he obtained the first option
from the trustees, and he procured like authority as to the 10-
acre tract from the North Avenue Land Company, on De-
cember 8th, more than two weeks before he obtained the op-
tion authorized by the Court, and which he afterwards ac-
cepted on June 10th following.   It appears from Mr. Calla-
way's own testimony that he discovered the desirability of the
North Avenue Land Company's tract, on the same day that he
discovered the need of the Vickers tract, so that his entire
scheme had assumed definite shape before he actually obtained
the first option from the trustees, though he states he had
been negotiating with them before that time.   It cannot there-
fore be successfully contended that this is a case of subse-
quent accidental appreciation in value.   It was previously ex-

isting inherent value, the knowledge of which had been communicated to the trustees a year before by Mr. Callaway, and when the enabling Act was passed by the Legislature and approved by the people at the election in the first week of November, we think due diligence and discretion required the trustees to bring this property to the notice of the city authorities with a view of securing for the trust estate at least some substantial measure of the profit which their option to Mr. Callaway put in his hands. If the petition to the Court had disclosed the purpose for which Mr. Callaway desired this land, it must be presumed the Court would have recognized the conformation of the land alluded to, as enhancing instead of depreciating its value, and it is difficult to imagine that the option would have been authorized at the price named, without proof of value for that particular purpose, and all the proof upon that point is, that $2,000 per acre is a reasonable price for that purpose. If the option would not, and ought not, upon a full understanding of the existing situation to have been authorized, we think the sale and purchase procured through that medium ought not now to be ratified. It is true, as observed by the learned Judge below : "that there is the risk that on a re-sale there may be no purchaser for it as a reservoir. The city may go elsewhere and condemn. But this is a risk the parties must take." Here, four of the seven interests in the property are excepting to the ratification of the sale, and three of these four are creditors of insolvent parties. This is a strong consideration for the Court, one not to be overlooked, as said in *Bank of Commerce* v. *Lanahan*, 45 Md. 412. There would have been the same risk however, if the authority for the option had been denied. As the matter now stands the ideal qualities of this site have been demonstrated ; an adequate basin carved out by nature; natural embankments of the proper character of earth well wooded and ready for parking; the presence of clay in the soil for puddling the embankments, and the absence of rock indicating opportunity for leakage; and finally a remarkably short line for the artificial embankment to close the reservoir. Unless nature has dupli-

cated this site in that vicinity, these advantages should go far to secure its selection a second time.

· This case was very fully and ably argued, and many other points were discussed by counsel, but we do not deem it necessary to prolong this opinion by reviewing them.

For the reasons assigned, the order setting aside the sale will be affirmed.

> *Order affirmed with costs to the appel-*
> *lee above and below.*

(Decided June 9th, 1904.)

McSHERRY, C. J. and JONES, J., dissent.