WEBB & KNAPP, INC. ET AL. *v.* THE HANOVER BANK ET AL.

[No. 46, September Term, 1957 (Adv.)]

(Two Appeals In One Record.)

232

*Decided July 2, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*M. William Adelson,* with whom were *Arthur C. Keefer, John G. Arthur, Jr., Herbert Myerberg* and *Eugene P. Smith* on the brief, for Webb & Knapp, Inc., appellant.

*Thomas R. Brooks,* with whom was *Karl M. Dollak* on the brief, for Norman Adolph, appellant.

*Ralph W. Powers,* with whom were *M. Hampton Magruder* and *Frank M. Foley* on the brief, for The Hanover Bank and John W. Ludewig as executors and trustees under the Last Will and Testament of William Woodward, Jr., deceased, appellees.

*Wilmer D. Pyles* for Guardian Ad Litem, appellee.

*Carlyle J. Lancaster* and *T. Hammond Welsh,* with whom were *Welsh, Dyer & Lancaster* on the brief, for William J. Levitt, appellee.

BRUNE, C. J., delivered the opinion of the Court.

The Hanover Bank, of New York City, and John W. Ludewig, as executors and trustees of the estate of the late William Woodward, Jr. (sometimes collectively referred to below as the "Trustees") filed a bill in equity in the Circuit Court for Prince George's County in which they reported a contract for the sale of a tract of approximately 2227 acres of land in that County, and the improvements thereon, known as "Belair Farm", to Webb & Knapp, Inc., at a price of $1,187,500, and asked the court to ratify the contract and to appoint a trustee to convey all right, title and interest of the parties to the cause to the purchaser under the contract.

The decedent's will was probated in New York, his domicil; and ancillary letters testamentary were issued to the executors in Maryland after an authenticated copy of the will had been duly recorded in Prince George's County. The purchaser and all persons known to have an interest in the property under the will of the decedent were duly joined as parties defendant. Some of the individual defendants were infants. Wilmer D. Pyles, Esq., was appointed guardian *ad litem* for them and, as such, he filed an answer to the bill and exceptions to the ratification of the contract of sale. Exceptions to the sale were also filed by William J. Levitt and Norman Adolf, each of whom was a would-be purchaser of Belair Farm.[1] After a hearing on April 11th and 12th, 1957, and the taking of considerable testimony, the Circuit Court entered an order on April 29th, 1957, refusing to ratify the proposed sale to Webb & Knapp, Inc., and ordering a resale after notice to all persons known to be interested in the purchase of Belair and after public advertisements of sale to be published in Prince George's County, Washington, Balti-

---

1. The Trustees advised them that they would be entitled to do so. See, however, *Cook v. Safe Deposit & Trust Co.,* 172 Md. 398, 191 A. 713.

more, Philadelphia and New York newspapers. Appeals were entered by Webb & Knapp, Inc., and by Adolf. Adolf claims to be also an appellee as against Webb & Knapp, Inc. (referred to below as "Webb & Knapp"). The other appellees are the guardian *ad litem*, Levitt and the Trustees. The Trustees state in their brief that they have presented to the trial court, and that there is in the record, all pertinent information concerning the decision to sell the real estate in question, the negotiations leading up to the contract of sale and the facts touching upon the sale which developed subsequently. They further state that all interested persons have been made parties, that adverse interests are represented by independent counsel or by the guardian *ad litem* for the infants, and that the Trustees take no position on this appeal. None of the adult individual beneficiaries under the decedent's will have taken any part in the proceedings in this case.

There is little, if any, dispute about the salient facts which are these:

The late William Woodward, Jr., owned Belair Farm, which had been in his family for two or three generations. He operated it as a farm and used it in connection with his racing stable. The main house is some two hundred years old, and was originally built for Governor Ogle. It has been considerably modernized as a dwelling. Belair is located some 15 or 18 miles from Washington, about the same distance from Annapolis and roughly 25 miles from Baltimore. (The distances from Washington and Annapolis are stated differently in the Bank's brochure and in the appraisal by Cruikshank Company, both referred to below.) It is traversed by U. S. Route 50 and by the new Washington-Annapolis expressway, and a branch freight line of the Pennsylvania Railroad runs along part of the western boundary. The tract is also near U. S. Route 301 and the Baltimore-Washington expressway.

All parties agree that the most profitable use for the tract is for residential purposes. The buildings other than the colonial Ogle mansion would be scrapped, and much of the wooded area, which is considerable, would doubtless be cut over for development purposes.

No member of the family of the decedent wishes to occupy the property. The Woodward estate is said to amount to approximately $12,000,000. Estate and inheritance taxes and other expenses are estimated at approximately $7,000,000. Cash is needed to pay the taxes. For these reasons the Trustees have concluded that Belair Farm should be sold. Their judgment in reaching this decision is not challenged.

The problem of how best to go about selling it faced the Trustees. They had a 1953 appraisal of the farm made in connection with the estate of William Woodward, Sr., of $300,000. Following the death of William Woodward, Jr., The Hanover Bank asked one of its Baltimore correspondents to recommend two experienced real estate dealers to make a new appraisal. Two well known Baltimore real estate men were so recommended and were employed. In March, 1956, they submitted an appraisal of the property as a farm as of the date of the decedent's death, October 30, 1955, of $435,000. In May, 1956, the Trustees received an indication that the property could be sold for $720,000. They then decided to employ Cruikshank Company, of New York, to appraise the property. The Cruikshank appraisal was made by or under the direction of that Company's Executive Vice-President, Mr. Gordon Kyle. That Company and Mr. Kyle have made many appraisals both in and around New York City and in a number of different localities elsewhere in the United States. Most of their work, according to the lengthy list of appraisals and the list of impressive clients submitted by Mr. Kyle, would appear to have been in the New York metropolitan area. Their out of town work appears to have been mostly in urban or industrial appraisals. Mr. Kyle made an appraisal of Patuxent Park, Maryland, which is said to be about 100 miles from Belair, but is not otherwise clearly described. The Cruikshank appraisal was submitted to The Hanover Bank under date of June 11, 1956. The sum of their appraisals of four tracts comprised in Belair, plus $100,000 for buildings, was $977,550, which they rounded off at $975,000.

Following the receipt of this appraisal, the Trustees prepared a brochure which, among other things, described the

property as consisting of "approximately 2,280 acres of gently rolling countryside which is readily adaptable for development purposes", stated that the property had good asphalt or gravel roads "connecting the several centers of activity", spoke of the main house built in 1746 for Governor Ogle and its surroundings, gave the general location of the property and stated "Price $1,250,000." It also stated that further particulars could be obtained from The Hanover Bank, and gave the name of Mr. B. Spier as the person to whom inquiries should be addressed.

Three officials of the Bank testified—Mr. Mapes, a Vice President, who was in direct charge of administering the Woodward estate, Mr. Spier, an Assistant Vice President in the real estate division (a part of the Personal Trust Department), and Mr. Blake, a Vice President in charge of the real estate and mortgage department. They testified that this property was handled in accordance with the Bank's usual policy which had been developed over many years. They asserted that the best results were obtained by stating an asking price, which was likely to be somewhat above what they would be willing to accept. In this instance they and Mr. Ludewig had added a little more than 25% to the amount of the Cruikshank appraisal, and with the approval of The Hanover Bank's Trust Investment Committee, given in June, and of their co-executor and co-trustee, Mr. Ludewig, used this figure in the brochure.

There had been close relations for many years between The Hanover Bank and the Woodward family—one or more of the decedent's relatives having held high office in the institution and the Trust Department having been active in the affairs of the family. Mr. Ludewig had been secretary to the decedent's father and had been intimately associated with Woodward family financial matters for years. The will of William Woodward, Jr., conferred extensive powers upon his executors and trustees, among them the power "To purchase, acquire, hold, manage, partition and to sell, exchange, convey, mortgage and grant options for the sale or exchange of real estate, or any interest in real estate, at such times

and for such prices, upon such terms and in such manner as they may deem advisable."

Mr. Ludewig appears to have followed every move and recommendation of The Hanover Bank in this matter and to have left the initiative entirely in the hands of the Bank. He had a personal familiarity with Belair Farm which very likely exceeded that of any of the Bank officials, but the negotiations to which we now turn were carried on by The Hanover Bank. Mr. Ludewig was consulted or informed from time to time of developments and his consent or approval was asked and given whenever necessary. That was apparently about the extent of his participation.

The circulars or brochures were sent out about September 8th or 9th, 1956, and were in the hands of the recipients on or about the 10th. Somewhat more than 1400 copies were sent out to real estate brokers and operators: 59 to New York, 52 to Prince George's County, 451 to Baltimore, 568 to Philadelphia, 259 to Washington, and 20 to persons who had previously made inquiries. There was no newspaper advertising, but press releases were issued, which, because of the Woodward fame in racing, received widespread publicity along the eastern seaboard.

Some 120 inquiries resulted up to September 20th. One offer of $1,000,000 was received, but rejected. Though the maker of this offer was known to Mr. Mapes, no effort was made to follow it up because, Mr. Mapes said, the offeror indicated that this was as high as he would go.

The situation changed materially when Mr. William Zeckendorf, President of Webb & Knapp, Inc., a large real estate developer, telephoned officials of the Bank on Thursday, September 20th, and offered $750,000 for the property. In the course of a single telephone conversation with Mr. Blake, Mr. Zeckendorf raised his offer to $1,100,000. He confirmed this by a letter dated September 20th, 1956, which stated:

"This will confirm Webb & Knapp's offer in behalf

of one of its corporations to purchase the above identified property [Belair] as follows:

| | |
|---|---|
| Price: | $1,100,000 |
| Terms: | All cash |
| Commissions: | Net |

"This offer is made to you for immediate acceptance. We would appreciate your prompt advice."

In the telephone conversation Mr. Blake had told Mr. Zeckendorf that the offer would have to be acted upon by the Trust Investment Committee (the "Committee"), which was to meet on Tuesday, September 25th. Mr. Zeckendorf agreed. The officials of the Bank having the sale of Belair in charge prepared a memorandum for the Committee which recommended acceptance of the $1,100,000 offer. Mr. Ludewig approved. On the morning of the 25th, Mr. McNeil, President of The Hanover Bank, telephoned Mr. Zeckendorf and induced him to raise the offer to $1,187,500. This brought the offer up to the Bank's net asking price after deducting commissions (for which Webb & Knapp were to assume liability) computed at 5% on $1,250,000, or $62,500. The memorandum to the Committee was revised in ink to reflect the verbally increased offer. Mr. Ludewig was not then consulted; his approval was assumed.

On the afternoon of September 24, 1956, a New York broker representing Mr. Levitt, who is also a large real estate developer and is widely known as such, telephoned The Hanover Bank to make an appointment for Mr. Levitt to come in to discuss Belair. There is some question as to just what was said in the conversation, but we think it quite clear that it was evident to the Bank that Mr. Levitt wanted to discuss the purchase of the property. He was given an appointment for the 26th. At least one of The Hanover Bank officials who testified in this case attempted (to us rather unconvincingly) to minimize the significance of Mr. Levitt's interest by saying that if he intended to meet the Bank's asking price he would have said so instead of seeking an interview. Mr. Levitt's testimony was that he wanted to ask a

number of questions, but that he was prepared first to offer $1,150,000 and, if that was not accepted, to offer the full asking price of $1,250,000. He stated an unwillingness to make offers by telephone and doubtless would have tried (as Mr. Zeckendorf did) to buy the property for less than the asking price. During the short time that the property had been on the market after issuance of the brochure Mr. Levitt and his representatives had inspected Belair on both weekends. We see no reason to question his testimony as to his intention or his ability to make good on an offer of $1,250,000 gross (without deduction for commissions). We think that he was sufficiently well known to the Bank as to lead it to believe that he was a responsible bidder.

There was testimony by a Washington lawyer that he, too, sought an appointment with The Hanover Bank for the purpose of making an offer for Belair on behalf of himself and some clients. He was given such an appointment. There is, however, considerable confusion as to the date when he telephoned for the appointment and the date for which it was fixed. At all events, when he arrived, which may have been on the morning of the 26th, and not the 25th, as he thought, he was told that the Bank could not discuss the matter with him and one of his clients who accompanied him, because the Trustees had already made a commitment, or the property had been sold.

Immediately after the Committee meeting, which was held at twelve o'clock on the 25th, Mr. Zeckendorf was informed that his offer had been accepted. About an hour later Mr. Levitt was notified that it would be useless for him to keep his appointment for the next day as a commitment had been made for the property. This not unnaturally produced an angry telegram and telephone call from Mr. Levitt to the Bank. On the following day he had a telephone conversation with Mr. McNeil. Mr. Levitt says that Mr. McNeil told him that Spier, with whom Mr. Levitt's appointment had been made, had not informed Mr. McNeil of the appointment. Mr. McNeil reiterated that the Bank had a commitment, and nothing of any substance resulted from that conversation.

On October 8th, 1956, Mr. Adolf, a New York lawyer

and a large real estate developer on Long Island, visited The Hanover Bank and made an oral offer of $1,400,000 gross, for Belair Farm, which he confirmed by letter the next day. He, too, was informed that the Trustees had a commitment for the sale of the property. Mr. Adolf had gotten wind of the Trustees' having received an offer of $1,250,000 before he visited the Bank.

Between September 25th and October 9th, counsel for the Trustees and counsel for Webb & Knapp had been engaged in drawing the contract of sale. It is a somewhat lengthy and carefully drafted document which spelled out the terms of the agreement fully. It covers in detail a number of matters which were appropriate for inclusion in such an agreement but which were not referred to in the brief written offer of September 20th. Some of these matters were a good deal more than mere matters of form and required consultation with the Trustees. All of the business terms appear to have been agreed to verbally by October 5th. The contract of sale was redrafted, was submitted to Maryland counsel for approval and was executed on October 10th.

One of the terms of the contract was not put in until the day of its execution. This was the provision for ratification by the Circuit Court for Prince George's County, as a court of equity, in addition to ratification by the Orphans' Court for that County as originally provided. This addition was made at the suggestion of Maryland counsel for the purpose of bringing in all persons interested in the estate as parties.

On December 12th, 1956, Mr. Levitt made a written offer to the Trustees of $1,500,000 for Belair Farm. This would amount to $1,425,000 net after commissions. Mr. Welsh, one of Mr. Levitt's attorneys, made a like offer on the same day on behalf of an undisclosed principal.

The present suit was instituted by the Trustees on January 3, 1957. Webb & Knapp had notified the Trustees on December 3rd that they had no objections to the title to Belair Farm, other than the lack of ratification of the sale and the liens of Federal and State taxes which had not been paid.

Some other facts will be referred to below in connection with questions as to which they seem pertinent.

242

The above lengthy recital of facts seems necessary to the consideration of the principal issue in this case. That issue is whether or not there was a lack of care, prudence and reasonable diligence on the part of the Trustees in selling Belair Farm, which resulted in their obtaining an inadequate price for the property. It seems necessary to consider several matters in seeking to resolve that issue: first, the adequacy of the Trustees' efforts to determine the value of what they had to sell; second, their method of offering the property; third, their closing with Webb & Knapp, without endeavoring to obtain better bids, despite the known interest of at least one party whose ability to make and perform an adequate bid for this property could hardly have been in doubt. Whether the Trustees were justified in rejecting a higher bid than Webb & Knapp's before actually executing the Webb & Knapp contract and in rejecting a somewhat higher bid later present somewhat different questions.

Before taking up these various matters it may be well to refer to some rules of law applicable to cases of this type.

There is such a thorough review of the Maryland cases dealing with the subjects here involved in Judge Collins' opinion in *Knight v. Nottingham Farms, Inc.,* 207 Md. 65, 113 A. 2d 382, that any extended discussion of them in this opinion would be of no practical value. It may be noted that Judge Henderson's dissent in the *Knight* case was on the application of the law to the facts of that case rather than on the general rules of law applicable to sales by fiduciaries.

If a conventional trustee submits the administration of his trust to the jurisdiction of an equity court, he must act as to the matters so submitted subject to the sanction of the court. *Abell v. Abell,* 75 Md. 44, 23 A. 71, 25 A. 389; *Gottschalk v. Mercantile Trust Co.,* 102 Md. 521, 62 A. 810; *Kramme v. Mewshaw,* 147 Md. 535, 128 A. 468. There is no dispute in this case that the court is to exercise its own judgment and is not to act as a mere rubber stamp for the trustee.

The rule applicable to the exercise of a discretionary power of sale conferred upon testamentary trustees is thus stated in *Gould v. Chappell,* 42 Md. 466, at 470: "The discretion thus reposed in the trustees was not *a mere arbitrary*

*discretion,* but a discretion *coupled with a trust,* and to be exercised solely for the benefit of *the cestuis que trust.* It was their duty, therefore, in making a sale of the property to act in a *prudent and business-like manner,* with a view to obtain as large a price as might, with due diligence and attention, be fairly and reasonably obtainable under the circumstances. In other words, to exercise that diligence and caution which a careful and prudent owner would observe in the sale of his own property. If the sale be made under circumstances of haste and imprudence, or if the trustees fail in reasonable diligence in inviting competition, or adopt an injudicious and disadvantageous mode of selling the property, a Court of Equity ought not ratify the sale." See also, *Callaway v. Hubner,* 99 Md. 529, 58 A. 362.

In speaking of the duties of a conventional trustee, as distinguished from a judicial trustee, this Court said in *Kramme v. Mewshaw, supra,* (at 147 Md. at 548) 128 A. at 473: "A conventional trustee, * * * who is proceeding without the assumption of jurisdiction by the court, is not affected by the regulations of the mode of sale in chancery, but he is bound, in the effort to secure the fair market value of the property, to employ that degree of care which a reasonably prudent man would exhibit in the conduct of a similar sale. *Miller's Equity,* secs. 493, 495, 488. If a sale should be made by a conventional trustee in good faith and according to his best judgment, the sale will not be set aside unless there exists an inadequacy of price that, under the circumstances, is directly attributable to some failure of reasonable diligence or effort in the making of the sale."

Later in the same case the Court said (147 Md. at 550-551): "While a private sale, without public advertisement, does not require the same degree of inadequacy of price and of a reasonable expectation that a re-sale will produce a better result as are necessary to defeat a sale by public auction, yet both an inadequacy of price and a justifiable expectation of securing a higher price must co-exist before a court will set aside a contract of private sale made in good faith by a conventional trustee in the exercise of a discretion which was in-

cident to an express power of sale. *Weinstein v. Boyd,* 136 Md. 227, 234; *Baer v. Kahn,* 131 Md. 17, 26, 27 * * *."

*Kramme v. Mewshaw* is cited with approval in *Knight v. Nottingham Farms, Inc., supra.*

Fiduciaries undertaking to exercise powers of sale must, of course, make proper efforts to learn the value of what they propose to offer for sale. *Park & Tilford Import Corp. v. Nash,* 166 Md. 373, 171 A. 339.

Mere inadequacy of price alone will ordinarily not warrant setting aside a sale. *Boyd v. Smith,* 127 Md. 359, 96 A. 526, and cases therein cited. See also *Shirk v. Soper,* 144 Md. 269, 124 A. 911.

Nor will the mere fact that someone else is later willing to pay more for the property by itself cause a sale to be set aside. *Blank v. Frey,* 165 Md. 647, 170 A. 156; *Cook v. Safe Deposit & Trust Co.,* 172 Md. 398, 191 A. 713; *Gilden v. Harris,* 197 Md. 32, at 42, 78 A. 2d 167.

We find nothing in the method of giving notice of the sale adopted by the Trustees which indicates lack of care, diligence or prudence on their part. They prepared and gave rather wide circulation to the brochure which they sent out and they took advantage of the fame of the Woodward racing stable to get a great deal of free newspaper publicity. They did not overlook the problem involved in selling so large a tract of land suited primarily for residential development or finding a purchaser able to pay a substantial price and able to finance the development of the property. (See *Kramme v. Mewshaw, supra,* where a like problem existed on a much smaller scale.)

The most critical decision with regard to the method of offering the property was whether or not to state a price. We think that the evidence shows that the Trustees were warranted in believing that they would obtain a better price by naming a figure. The Bank had had much experience in real estate sales and had found that invitations to submit bids were not likely to produce the best offers.

The decision to name a price carried with it the need to exercise prudence, care and diligence in fixing the price. That was the key to everything that was to follow. Ob-

viously, the first step was to obtain a sound appraisal of the property. Neither the assessed value for local taxes nor the 1953 appraisal made in connection with the estate of William Woodward, Sr., was of much use. The 1956 appraisal obtained from two Baltimore real estate men appears to have been made on the basis of the property being used as a farm, which was not very helpful in valuing it for development purposes, as the Trustees doubtless knew. An actual or indicated offer of $720,000 as against that appraisal of $435,000 apparently led to their seeking a new appraisal on a different basis. They employed a firm which they regarded as highly competent, which was unquestionably thoroughly experienced in making appraisals in the New York metropolitan area and probably of other urban or industrial property. There is little, if anything, to indicate any experience or familiarity with Washington suburban developments. The growth in population of that area in recent years is a matter of common knowledge in this State and doubtless in the City of Washington. There is nothing to show any consultation which the New York appraisers may have had with any real estate broker or operator in the Washington suburban area. It is, to us at least, a surprising fact that no representative of the appraisal firm was present to testify at the hearing. As a result, the trial court sustained an objection to the admission of the appraisal as "direct evidence of appraised value as such." It was admitted "as evidence in the hands of one of the executive officers of one of the executors."

There is no question as to the good faith of the Trustees in relying upon that appraisal as a measure of value, but there is a wide area of doubt as to the sufficiency of their study of the real estate market in the Washington suburban area. There is also not very much to show just how they arrived at the amount to be added to the Cruikshank appraisal for the purpose of fixing the asking price.

It is difficult to segregate hindsight from foresight in examining a situation such as that which is before us, and it is easy as a matter of hindsight to conclude from a present offer of more than 50% above the amount of the appraisal and 20% above the asking price, that the appraisal was none too

sound. The property in question is very nearly if not quite unique as probably the largest tract of land under single ownership available for development in the fast growing metropolitan Washington area. To determine the value of such a tract would seem to call at least for consultation with some competent real estate dealer or operator in that locality. The lack of familiarity of the New York firm with local conditions is shown by a matter which of itself is of little importance. That is a reference to the supposed difficulty of effecting a change in zoning regulations. No such regulations were applicable to Belair Farm when the appraisal was made.

It is a familiar fact that, once a sale price for a tract of land has been agreed upon, someone else is likely to put in an appearance and offer to pay more. If the Trustees had done everything which reasonable prudence would seem to call for in determining the value of this tract, we should attach little importance to subsequent offers. Their failure to obtain local expert advice seems to us to amount to the omission of a step which reasonable prudence called for. Its absence, we think, cannot be supplied either by the personal familiarity of some of the Bank officers and of the individual executor and trustee with the property or by the general competence of the appraisal firm. It might have been supplied by testimony of the individual in charge of the appraisal as to the extent of his investigation of the local market, but it was not. To suppose that he had canvassed that field is a matter of conjecture on the present record. The evidence of unfamiliarity with local conditions which the reference to non-existent zoning regulations indicates, makes it more difficult than it might otherwise have been to assume what he had done. The Trustees' apparent lack of knowledge of local conditions is emphasized by the testimony of Mr. Spier, the official of the Bank from whom, the brochure stated, further particulars might be obtained. He testified that Mr. Williams, the broker who later made the appointment for Mr. Levitt, first came to see him about Belair on September 16th and inquired, as the witness recalled it, (whether then or on the 24th is not quite clear) "what the zoning regulations are down at Belair,

what the utilities are, and various questions which prospective purchasers really want, but I didn't have that."

If one assumes that the valuation upon which the Trustees were proceeding was arrived at with due diligence and prudence, their handling of negotiations and would-be negotiators might well be more readily sustainable. There is force to Mr. Zeckendorf's contention that the Trustees did not accept his offer, that he accepted theirs. They asked a price of $1,250,000. He met their net asking price by submitting a bid equal to their gross price less commissions. The Trustees would doubtless have found it very difficult to reject a complete acceptance of their own offer. They were not, however, confronted with that problem when Mr. Levitt's broker, early in the afternoon of September 24th sought an appointment for Mr. Levitt, since Mr. Zeckendorf did not meet the Trustees' price until Mr. McNeil telephoned him the following morning.

Mr. Ludewig was informed on the 24th of Mr. Levitt's request for an appointment, and several of the officials of The Hanover Bank who were in direct charge of the sale of Belair knew of it. (The President was not then informed of it.) These officials went right ahead with their plan to ask the Trust Investment Committee at its meeting on the 25th to approve the sale of Belair Farm for $1,100,000, net; and the Trustees made no effort to obtain a bid from Mr. Levitt. It is unnecessary to review the effort of one of the Bank officers, which we find unconvincing, to justify this course of action. Making an appointment with Mr. Levitt for the day after their recommendation for the sale to Webb & Knapp was to be acted upon was at best a solemn farce, and under the circumstances then existing would seem almost certain to choke off the possibility of a higher bid from Mr. Levitt. Whether or not the handling of this particular matter actually resulted in a loss to the estate is difficult to say, because Mr. Levitt's testimony indicates that at that time he was not contemplating a bid of more than $1,250,000, gross, and that his first figure would have been lower. His bid of a higher amount was not made until more than two months later. What would have happened and what course the

Trustees should have pursued if both Mr. Zeckendorf and Mr. Levitt had submitted bids meeting the Trustees' asking price might furnish bases for interesting discussions, but on the facts before us no question is presented as to what would have been the duty of the Trustees in such a situation.

Neither the celerity with which Mr. Zeckendorf raised his bid during a single telephone conversation from $750,000, on terms, to $1,100,000, all cash, free of commissions (equivalent to approximately $1,157,900 before commissions, and more than $180,000 above the Cruikshank appraisal) nor the appearance on the scene as a prospective bidder of Mr. Levitt, another giant of the industry, shook the dogged adherence of the Trustees to their notions of value and price, which were based essentially on the Cruikshank appraisal. We think that these developments might well have given the Trustees pause in that they tended to cast doubt then upon the adequacy of the data upon which the Trustees were proceeding. They emphasize now the deficiency of the Trustees' data as to local conditions which the trial court found to exist—a view which we think is supported by the evidence.

Turning now to Mr. Adolf's contention that the property should be awarded to him for $1,400,000, we find no merit in it. His bid was not made until after he knew that the Trustees had already gotten their price. We think that in all business essentials there had been a meeting of the minds between the Trustees and Webb & Knapp by October 5th, which was several days before Mr. Adolf appeared upon the scene. Though the evidence is not as clear as it might be, we think that Webb & Knapp was bound either as principal or as agent for a partly disclosed principal. A chancery sale is held not to be within the Statute of Frauds, and the same rule has been held applicable to a sale by executors pursuant to a power, where the sale must be reported to an Orphans' Court for ratification under Code (1951), Article 93, Section 312 (unless an equity court assumes jurisdiction over the sale). *Warfield v. Dorsey*, 39 Md. 299; *Warehime v. Graf*, 83 Md. 98, 34 A. 364. An accepted purchaser is not to be displaced for a late-comer. *Cook v. Safe Deposit & Trust Co., supra.*

The above reason alone would be sufficient for dismissing Mr. Adolf's appeal. An additional reason is that he did not advance this claim by any pleadings in the trial court which he now seeks to assert by appeal. His appeal will be dismissed.

The actual evidence as to the value of Belair Farm leaves a good deal to be desired. The testimony of a local, experienced real estate appraiser employed by Mr. Levitt is that the value is almost precisely the amount of Mr. Levitt's latest bid. Though this valuation may have more than a tinge of hindsight, it is not squarely contradicted. The Trustees produced the Cruikshank Company appraisal, but not the appraiser. The appellant, Webb & Knapp, seeks to get the benefit of that appraisal as an indication of value by proclaiming the competence and experience of the Cruikshank Company. That might be very persuasive on an issue of good faith on the part of the Trustees, but their good faith is not attacked.

The Trustees' whole handling of the sale was based upon the soundness of their valuation. Their dealings with Webb & Knapp and their putting off of Mr. Levitt were based upon the proposition that when they got the price which they had determined upon, their job was done. As we have said, we find no fault with their putting the property on the market through the distribution of brochures, with the adequacy of the publicity of the offering, or with their stating a price for the property. The crux of the matter in this method of sale is the sufficiency of their efforts to arrive at a sound valuation. The appellant earnestly stresses the matching of wits on the matter of price as between itself and the Trustees, which resulted in the Trustees' getting their full asking price; but that is of little significance unless the asking price was based upon adequate data. (Parenthetically, we note that the appellant appears very well satisfied with the result of the matching of wits.) Every one of the considerations just mentioned emphasizes the vital importance of the adequacy of the steps taken by the Trustees to arrive at the price at which they would sell the property. The lack of thorough investigation of local conditions, to which the record before

us points, is the fundamental ground upon which we think that the decree of the Circuit Court refusing to ratify the sale should be affirmed. *Knight v. Nottingham Farms, Inc., supra.*

No objection (other than that of Mr. Adolf, which we have already considered and rejected) is made to the terms of the decree with regard to reoffering the property and we are therefore not called upon to review those terms, which are obviously designed to hold the benefit of the highest bid which has been submitted.

> *Appeal of Norman Adolf dismissed, his costs as appellant to be paid by him.*
>
> *Decree affirmed, costs (other than those of Norman Adolf as appellant) to be paid out of the estate of William Woodward, Jr.*