# THE CITY OF BOWIE *v.* AREA DEVELOP-
# MENT  CORPORATION

[No. 369, September Term, 1970.]

*Decided April 12, 1971.*

The cause was argued before HAMMOND, C. J., and FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Ralph J. Luttrell,* with whom was *Joseph S. Casula* on the brief, for appellant.

*Richard W. Case,* with whom were *Michael A. Pretl* and *Smith, Somerville & Case* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

Until about 10 years ago, The City of Bowie (Bowie) remained, as it had been for years, a small town in Prince George's County, about equally distant from Annapolis and Washington. In 1960, its population was 1,489, *Maryland Manual* 1965-1966 at 746. In that year, a dramatic change began when Levitt & Sons, Inc. (Levitt) purchased Belair Farm, a tract of more than 2,000 acres, which had been operated by the late William Woodward as a farm and racing stable.[1] By later purchases the tract was increased to some 3,000 acres.[2]

Levitt commenced promptly to develop Belair Farm as the residential community now known as Belair and built in the next decade about 7,600 houses and some commercial and service properties there. As a part of the plan of development Area Development Corporation (Area Development), a Levitt subsidiary, constructed water and sewerage facilities which were designed to serve Belair

---

1. See *Webb & Knapp, Inc. v. Hanover Bank,* 214 Md. 230, 133 A. 2d 450 (1957).
2. *Board of County Comm'rs of Prince George's County v. Levitt & Sons, Inc.,* 235 Md. 151, 200 A. 2d 670 (1964).

and ultimately, Bowie, as well.[3] This approach was dictated by the fact that Bowie had neither the resources nor the borrowing capacity to finance a project of this magnitude.

By 1961, Bowie had annexed Belair, by extending a corridor from the old town of Bowie, which became known as Huntington, to encompass the Levitt development, and as a result has become the largest city in Prince George's County, with a population of more than 31,000. At about the time of the annexation, negotiations were undertaken with Area Development which culminated in the execution of a lease in October, 1961, under which Area Development leased to Bowie for a 50-year term, the water and sewerage systems (the Systems) which were then under construction, and upon completion Bowie operated the Systems.[4]

Article Third of the lease provided that commencing with the calendar year 1962, Bowie would pay to Area Development as rent for the Systems, a quarterly amount of $9.375 for each residence connected to the water system, and a quarterly amount of $9.375 for each residence connected to the sewer system, to which would be added 50% of Bowie's charges for water and sewer service furnished for uses other than residential.

The lease went on to provide in Article Third (B):

"The parties, recognizing that there will be significant economic fluctuations during the term of this Lease, agree as follows:

"(1) Either party may, by giving written notice to the other party during the third calendar quarter of any year during the term hereof, commencing with the year 1966, request an appraisal of the reproduction cost of that part of the demised properties then used and useful

3. At this same time, Bowie had a water, but no sewerage system. See *City of Bowie v. Washington Suburban Sanitary Comm'n,* 249 Md. 611, 241 A. 2d 396 (1968).
4. See *Area Development Corp. v. Free State Plaza, Inc.,* 254 Md. 269, 254 A. 2d 355 (1969).

and not in excess of the reasonable requirements of the Lessee for providing service to users of either the water systems or the sewage systems, less physical and functional depreciation thereon.

"(2) Within ten (10) days after such notice, the parties shall jointly select a qualified appraiser. In the event that the parties are unable to agree on an appraiser within such period, then upon application of either party, after five (5) days' written notice to the other, the Dean of the College of Engineering of the University of Maryland shall designate such appraiser, or if the Dean agrees only to furnish a list of recommended appraisers, then such appraiser shall be selected therefrom by lot. The determination of such appraiser shall be binding upon the parties.

"(3) There shall be furnished to the appraiser the plans and specifications of the demised properties and all additions, changes and substitutions which are part thereof including all additional facilities provided for in paragraph (G) of Article Second of this Lease Agreement. The appraiser shall make his determination of depreciated reproduction cost by applying the then current costs applicable to the various components being appraised and deducting therefrom physical and functional depreciation. The value of cash working capital furnished by Lessor or other expenses capitalized by Lessor pursuant to this agreement, including any rent abated hereunder under the terms of paragraph (C) (1) of this Article, shall be included as components to be appraised. Such appraisal shall be rendered in writing to each of the parties hereto prior to the close of the quarter in which such appraisal is required to be made.

"(4) The cost of such appraisal shall be borne by the party requesting it.

"(5) As of the first day of January of the year next succeeding the year in which such request shall have been made, Lessee shall pay annually as additional rent hereunder, an amount which, together with the minimum rent specified in paragraph (A) of this Article Third, shall be equal to six per centum (6%) of said depreciated reproduction cost of said part of the demised properties. Such adjusted rental shall be payable for each calendar year thereafter until a new adjusted rental (either upward or downward) shall become effective pursuant to a further appraisal, which further appraisal may not be requested until the third quarter of the third year during which such adjusted rental has been in effect."

In August, 1968 (during the third calendar quarter, as contemplated by the lease), Area Development requested that an appraisal of the Systems be made on which an adjustment of rental could be predicated, and suggested that the work be undertaken by the engineering firm of Whitman, Requardt and Associates, which had designed the Systems. Bowie acknowledged receipt of the request but rejected the selection of Whitman, Requardt and Associates. The City's letter said in part:

"Please be advised that the Mayor and Council of the City of Bowie do not agree with your selection of the firm of Whitman, Requardt and Associates as the qualified appraiser.

"On this basis we urge the referral of the selection of an appraiser to the Dean of the College of Engineering of the University of Maryland."

In due course, Dean Robert B. Beckmann of the University selected Benjamin E. Beavin Company (Beavin) of

Baltimore to make the appraisal. On 10 October 1968, Area Development's counsel requested Beavin to make the appraisal. In a letter dated 25 October addressed to Bowie and Area Development, Beavin accepted the assignment and outlined the procedure which would be followed. The letter stated in part:

> "The results will be submitted first by letter report giving the result of our appraisal, broken down into the major categories estimated. Approximately six weeks later, we will submit twelve copies of a more complete report containing back-up data. The estimates will be arranged, insofar as possible, to permit updating them from time to time with a minimum of effort.
>
> "We have started work on the project and will prosecute it vigorously, making every effort to have the letter report in your hands by December 21, 1968. Because there may be unforeseen complexities or conditions beyond our control, we cannot guarantee this date."
>
> ✿ ✿ ✿
>
> "The City of Bowie is requested to forward to us any information it believes we should have in order to perform our work properly. The City also should name a contact man to whom we may address any questions and arrange for inspections."

Beavin prepared and submitted an appraisal report on 18 December 1968, which concluded that reproduction cost of the Systems as defined in the lease, less physical and functional depreciation, was $12,677,508. Area Development then notified Bowie that accounting from 1 January 1969, the annual rent would be increased to $760,650.48, *i.e.*, 6% of $12,677,508.[5]

---

5. In 1968, Bowie had paid Area Development rent in the amount of $543,029.48. The increase in rent would have apparently increased the quarterly amount of $9.375 for each service connection by $7.86.

As it turned out, Bowie designated no contact man and made no criticism of the appraisal procedure until 13 January, after the receipt of the letter appraisal but before the receipt of the back-up data. It notified Area Development that it would "reject and repudiate" the proposed increase in rent "as having no justification under the Lease Agreement and being contrary to the welfare of the citizens." Area Development brought suit for declaratory and injunctive relief in the Circuit Court for Prince George's County. From a decree declaring the Beavin appraisal to have been made in accordance with the provisions of the lease; declaring Article Third B (the appraisal provision) of the lease to be binding on Bowie, and directing Bowie to pay a rent of $760,650.48 annually accounting from 1 January 1969, Bowie has appealed.

While Bowie fragments its argument, it is essentially this: because Bowie was without power to enter into a lease which delegated the fixing of rates to another, the lease is ultra vires, illegal and void. Bowie bottoms this contention on the theory that while the operation of the Systems may be a proprietary function, *Lewis v. Mayor & City Council of Cumberland,* 189 Md. 58, 66, 54 A. 2d 319 (1947); *Home Owners' Loan Corp. v. Mayor & City Council of Baltimore,* 175 Md. 676, 680, 3 A. 2d 747 (1939); *Westminster Water Co. v. Mayor & Common Council of Westminster,* 98 Md. 551, 563, 56 A. 990 (1904), the fixing of rates like any other governmental function can be neither delegated nor surrendered to an independent agency in the absence of a specific grant of power, *Pressman v. Barnes,* 209 Md. 544, 552, 121 A. 2d 816 (1956); *Mugford v. Mayor & City Council of Baltimore,* 185 Md. 266, 271, 44 A. 2d 745 (1945); 10 McQuillin, *Municipal Corporations* § 29.07 at 244 (3d ed. 1966 Rev. Vol.).

Additionally, Bowie argues that even if Article Third (B) is conceded to be valid, Area Development's performance was deficient since while the appraisal in letter

form was delivered in December 1968, the data which underlay it was not available until January 1969.

Finally, Bowie argues that its participation in and failure to object to the appraisal procedure did not estop it from raising the defense of ultra vires and that its demurrer should have been sustained, relying on *Gontrum v. Mayor & City Council of Baltimore,* 182 Md. 370, 35 A. 2d 128 (1943).

It appears to us that these are bolts which fall far short of the mark. On 20 July 1960, apparently in anticipation of the negotiations to be undertaken with Area Development, Bowie amended its charter, adding new Sections 121 (a) and 121 (b) which immediately followed § 120 of the Code of Public Local Laws of Prince George's County (Everstine ed. 1953). Section 121 (a) provided:

"121 (a). *The Commissioners of Bowie are hereby authorized and empowered to* construct, erect, purchase in fee simple by condemnation, private sale or otherwise, *lease for term or terms of years, renewable at the pleasure of the Commissioners any water plant or water plants for the purpose of supplying water to residences or other properties either within or without the limits of said Town;* and said Commissioners are further authorized and empowered to do any and all things necessary for the operation, control, maintenance and supervision of any such plant or plants; and said Commissioners are further authorized and empowered to fix schedules and rates for supplying water to private residences or other buildings; and said Commissioners are further authorized and empowered to issue revenue bonds, to be paid from revenue only earned from the operation of such plant or plants to pay for any construction, erection, extension or alteration of any such plant or plants; *and said Commissioners are further au-*

*thorized and empowered in the event of a lease or rental of such plant or plants by said Commissioners to provide for the payment of such lease or rental charges as may be incurred,* by the execution and delivery of 'anticipated revenue' certificates, said revenue to be derived from the operation of such plant or plants; and said Commissioners are further authorized and empowered to borrow money, upon the faith of such 'anticipated revenue' certificates for the purpose of operating such plant or plants until such time as revenues from such plant or plants become sufficient to defray the costs of operation; and it is further provided that any and all obligations arising from the lease or rental by the Commissioners of any such plant or plants shall be paid solely from the income derived from the operation of such plant or plants and the general funds or credit of the Town shall be in nowise pledged to the payment of such obligations." (Emphasis supplied.)

Section 121 (b) is cast in identical terms but deals with sewer plants. In 1963, the charter of Bowie was revised. Section 5-76 (a) of the Code of Public Laws of Prince George's County (Everstine ed. 1963) now gives Bowie the power to "lease, operate, and maintain water systems and water plants, sanitary sewerage systems and sewerage treatment plants * * *" and Section 5-76 (c) authorizes Bowie to make payments of rent from operating income.

While Bowie does not deny that Sections 121 (a) and 121 (b) empowered it to lease and operate the Systems, it argues that the lease suffers from a fatal infirmity, when it denies Bowie the right to fix the charges to be made—a right which Bowie conceives to be a governmental function, which it cannot surrender.

Area Development says, and we think quite rightly, that there are two answers to this contention. The first

is that the lease does not fix the rate which Bowie may charge and collect, although the rent may have an effect on the rate, but rather the amount that Bowie must pay. The rent is simply a part of Bowie's operating costs and may be likened to the wages paid the employees who operate the Systems, or the costs of repairs to and replacement of equipment. There is evidence that Bowie not only imposes the quarterly charge for each service connection, but also charges from 18¢ to 20¢ per 1,000 gallons of water used, and then duplicates the same charge for sewer service. It is from these charges that the operating costs of the Systems are met. Area Development gets no benefit from this, save in the case of charges based on use which are imposed on non-residential users.

Area Development then says that Bowie misconceives the function of the appraisal, which is intended to establish a fact by the use of professional expertise which neither Bowie nor Area Development has available. A somewhat comparable situation would exist in a case where the rent to be paid during the renewal term of a lease was, under the provisions of the lease, to be fixed by an independent appraiser. In fact, just such a provision was sustained in *Mayor & City Council of Baltimore v. Baltimore Steam Packet Co.*, 164 Md. 284, 164 A. 878 (1933), where the municipality was the lessor.

Area Development analogizes the situation to the function performed by an appraiser in a condemnation case or to a contract containing a mandatory arbitration provision which is binding on a municipality which enters into such an agreement, *Mayor & City Council of Baltimore v. Allied Contractors, Inc.*, 236 Md. 534, 204 A. 2d 546 (1964) ; *Nelley v. Mayor & City Council of Baltimore*, 224 Md. 1, 166 A. 2d 234 (1960) ; 17 McQuillin, *Municipal Corporations* § 48.20 at 127 (3d ed. 1968 Rev. Vol.).

What happened here was that Bowie and Area Development had agreed to have the value of the Systems determined by an independent expert. This did not establish the rent which Bowie was required to pay, but was

rather an ingredient which went into a pre-determined formula: the determination of the value to which a 6% rate of return would be applied. See *Litman v. Holtzman,* 219 Md. 353, 359, 149 A. 2d 385 (1959).

Since we have concluded that Article Third (B) of the lease was valid and binding on Bowie, Bowie's remaining contentions can be disposed of in summary fashion. There is no merit to the point that documentary support for the appraisal letter was not available to Bowie until January, 1969. Before the end of December, Bowie had received the appraisal letter which set forth Beavin's conclusions, and Area Development's demand that the new and increased rent be effective from 1 January 1969. Bowie rejected the Beavin appraisal without examining the documentary support. Even had it chosen to make such an examination, it would have suffered no prejudice because the rent was payable quarterly, in arrears, within 30 days of the end of the calendar quarter. In other words, while the new rent became effective on 1 January, it would have been paid by Bowie on or before 30 April 1969.

On the demurrer point, we have repeatedly said that it is rarely appropriate to sustain a demurrer in a declaratory action without declaring the rights of the parties, *Garrett County Sanitary District, Inc. v. Mayor & Town Council of Oakland,* 249 Md. 400, 401, 240 A. 2d 228 (1968); *Hunt v. Montgomery County,* 248 Md. 403, 408-10, 237 A. 2d 35 (1968); *Shapiro v. County Comm'rs for Prince George's County,* 219 Md. 298, 302-03, 149 A. 2d 396 (1959). While the chancellor may well have relied on these cases in overruling the demurrer, he reached the right result, because the complaint, under his view of the case and ours, stated a cause of action.

*Decree affirmed; costs to be paid by appellant.*