324 So.2d 234 (1975)
Alden McNAIR et al., Complainants-Appellants,
v.
CAPITAL ELECTRIC POWER ASSOCIATION et al., Defendants-Appellees,
Charles R. Riddell and W.E. Harreld, Jr., Intervenor-Defendants-Appellees.
No. 48359.
Supreme Court of Mississippi.
December 22, 1975.
*236 John K. Keyes, Collins, Daniel, Coker, Horton, Bell & Dukes, Thomas H. Suttle, Jr., Jackson, for complainants-appellants.
Case, Montgomery & Smith-Vaniz, Canton, Watkins & Eager, Jackson, Robert L. Goza, Canton, for defendants-appellees.
Before PATTERSON, INZER and SUGG, JJ.
PATTERSON, Justice:
This appeal arises from the Chancery Court of the First Judicial District of Hinds County. The court at the conclusion of a fifteen-day trial excluded the evidence of the appellants and dismissed their bill of complaint. The suit, a derivative action for the benefit of the complainants, other member-owners and the Association, alleged a cause of action by member-owners of Capital Electric Power Association against its directors for constructive fraud.
The original bill of complaint was filed on December 8, 1972; a demurrer was interposed; the bill was amended; a preliminary injunction was denied; a motion to strike the amendment was filed; Mississippi Power & Light Company was brought in as a defendant; additional demurrers were filed; Mississippi Power & Light Company was dismissed; the Association was made a defendant instead of a complainant; and thereafter a second amended and supplemental bill of complaint was filed. The complainants (now appellants) are some of the member-owners of the Association. The defendants (now appellees) are the directors of the Association, the Association, and Charles R. Riddell and W.E. Harreld, Jr., intervening member-owner defendants, favoring a vote by the membership.
The bill of complaint sought:
1. A temporary injunction restraining each of the defendants from performing any act toward consummating a sale of the *237 Association to Mississippi Power & Light Company under a proposed "purchase agreement."
2. An adjudication that the special meeting of the membership of the Association on December 21, 1972, was void, that no voting thereat, whether in person or by proxy, was legally effective and that the signing of the "purchase agreement" by the Association was invalid.
3. An adjudication that the directors/defendants by their conduct as fiduciaries to the member-owners of the Association abdicated their duties as directors and that their offices be declared vacant and they be enjoined from acting in the capacity of directors.
4. The appointment of a commissioner to manage the Association under the court's direction until a new board of directors could be installed.
5. In due course the dismissal of the commissioner and the placement of the affairs of the Association in the hands of the new board of directors to be managed in accord with law.
6. A report by the complainants of their costs and expenses incurred by this suit and that the Association be directed to reimburse the complainants for the same.
7. The retention of jurisdiction by the court during the course of litigation until all matters involved were finally determined by an adjudication upon the merits.
The foregoing prayers of the bill of complaint were put in issue by the defendants' answers.
The record consists of 24 volumes containing 4,752 pages of pleadings and testimony. However, the record has been reduced to 254 pages by abridgment for appeal. The ultimate question, as we view it, is whether the chancellor correctly decided the factual issues.
The appellants have filed fifteen assignments of error. For brevity we will combine similar assignments and discuss the arguments presented by the appellants with the appropriate evidence for each rather than engage in a prolonged statement of facts. However, an introductory statement of the case is necessary for its understanding.
Capital Electric Power Association was a nonprofit cooperative membership corporation engaged in the transmission, distribution and sale of electricity to its member-owners at cost. It furnished these services to members in Hinds, Warren, Claiborne, Copiah, Rankin, Madison and Leake Counties pursuant to the Electric Power Association enactments, Mississippi Code Annotated section 77-5-201 et seq. (1972).
By statute the Association was owned and operated by its members-consumers. They elected directors for a three-year term in accord with Mississippi Code Annotated section 77-5-221 (1972) and those elected comprised the board of directors. The board supervised the operation and management of the Association. The area served was having rapid growth in residential, business and industrial customers. The Association held an exclusive "Certificate of Public Convenience and Necessity" in the service area of its member-owners under the Public Utility Act of 1956. It was one of the fastest growing electric power associations in the state with expected expansion from its 16,000 members at the time of the suit to 40,000 or 45,000 members within the decade. The annual revenues were expected to increase within the period from $4,000,000 to about $20,000,000.
The appellants charged the board of directors with secret negotiations with Mississippi Power & Light Company (MP&L) to sell the Association. They alleged nothing was known of the bargaining until November 27, 1972. On November 28, 1972, *238 information concerning the proposed sale was mailed to the member-owners. The contents of the mail packets were:
1. A bound pamphlet containing (a) a printed letter from T.L. James, president of the Association, to each member advising of a proposal by MP&L to purchase the electric system and other properties of the Association for $10,500,000, (b) notice from H.W. Wolcott, secretary of the Association, that the directors had called a special meeting of the members at Clinton, Mississippi, on December 21, 1972, to consider action upon the proposal, advising that the member need not attend in person, but could vote by proxy through the mail, and (c) a copy of the proposed "purchase agreement;"
2. A pamphlet entitled "Explanation of Purchase Agreement;"
3. A "proxy" form empowering, upon completion, the board of directors or any one of them to cast the member's vote either "for" or "against" the sale;
4. An addressed and stamped envelope in which to return the proxy.
This material was received by members of the Association on November 29 or 30, 1972.
Thereafter, the appellants were elected as a "steering committee" by a number of the member-owners called "Group of Concerned CEPA Members" to seek, on behalf of all members with similar views, redress of the wrongs they maintained were being inflicted upon them and the Association.
The complainants maintained the actions and inactions of the directors in connection with the proposed sale of the Association to MP&L, in cumulative effect, constituted a fraud upon their rights as member-owners of the Association.
The trial court was of the opinion the board of directors was not guilty of either actual or constructive fraud, the submission of the purchase offer by MP&L to the vote of the membership was not unreasonable, the meeting of December 21, 1972, was not improper, and, for whatever reason, more than three-fourths of the members voted, the result being in excess of 50% of the votes cast to consummate the sale. The court held it was unable to find any reason from the evidence why that determination should be overturned. It noted there was no proof of loss to any member-owner unless it was by way of anticipated future profits and nothing to show any or what would be realized by any member.
The appellants first argue that all facts which appellants' evidence fairly tends to establish, with all reasonable inferences therefrom, must be taken as true at the close of the complainants' case and if either establishes the complainants' cause of action, a verdict for the defendants should not be granted, citing Cameron v. Hootsell, 229 Miss. 80, 90 So.2d 195 (1956). They further contend in reviewing the evidence on appeal, this Court must consider as true the complainants' evidence and the reasonable inferences therefrom. Williamson v. Inzer, 239 Miss. 707, 125 So.2d 77 (1960). From this it is argued the appellants' evidence and inferences therefrom must be assumed as true for purposes of this appeal. We agree with this legal concept, but find a stipulation of the parties that all testimony, exhibits and pleadings considered during preliminary hearings of the cause would be a part of the record and considered as evidence on the hearing on the merits. It is, therefore, before us.
Moreover, the complainants called as adverse witnesses each of the defendant-directors and this was followed by direct examination of the directors' and the intervenor-defendants' attorneys. The motion of the defendants for judgment when the complainants had rested their case on the final hearing was thus for consideration on the entire record and was not limited to the sole testimony of the complainants. This brings into focus the *239 well-established rule that a chancellor will not be reversed upon a finding of fact unless this Court can say that he was manifestly wrong in his finding. Donohoe v. Aultman, 240 Miss. 304, 127 So.2d 395 (1961). We presently forego elaboration upon the sufficiency of the facts to support the trial court opinion since subsequent arguments bring much of it into view. Suffice it to say, for the moment, there was ample evidence to support the trial court's conclusions.
By Proposition II the contention is made that the directors of the Association were statutory trustees for the membership and were guilty of constructive fraud by violating their fiduciary duty. The Laws of 1936, Chapter 184, brought forward as Mississippi Code Annotated section 5463 et seq. (1942) and again as Mississippi Code Annotated section 77-5-201 et seq. (1972) created the "Electric Power Association Law." Throughout references are made to the board of directors, and Section 77-5-223 authorized them to conduct the corporate business.
Section 77-5-221 specifies that the directors must be members of the corporation and prohibits compensation for their services. Section 77-5-237 delineates the method of disposing of corporate property, providing initially that "No corporation may, unless authorized so to do by the votes of at least a majority of its members, sell, mortgage, lease or otherwise encumber or dispose of any of its property... ." concluding with "All such persons shall be deemed to have a beneficial interest in the affairs of the corporation insofar as the sale or lease of the property of the corporation is concerned and the members of the board are hereby declared to be the trustees of such persons with respect thereto." (Emphasis added.) We conclude the legislature's intention was to make the board of directors trustees for purposes of sale even though compensation was not authorized for this responsibility.
The appellants next address the theme of there being a violation of the fiduciary duties imposed upon the trustees for the disposition of the property. Once the offer of purchase was made the trustees placed it before the member-owners in accord with Section 77-5-237. They made no recommendation as to its acceptance or rejection. The book value of the assets was set forth in the literature, but no independent survey of the Association's worth was made nor were the member-owners informed of MP&L's proposal, in the event the purchase was made, that the trustees of the Association would compose an "advisory committee" to MP&L for twelve years and be compensated $200 per month each during such interval.
In Restatement (Second) of Trusts, section 173 (1959), we note that a trustee has the duty to the beneficiary, upon request, to furnish at reasonable times complete and accurate information as to the nature and amount of trust property.
... In dealing with the beneficiary on the trustee's own account, however, he is under a duty to communicate to the beneficiary all material facts in connection with the transaction which the trustee knows or should know ... Even if the trustee is not dealing with the beneficiary on the trustee's own account, he is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person with respect to his interest. Thus, if the beneficiary is about to sell his interest under the trust to a third person and the trustee knows that the beneficiary is ignorant of facts known to the trustee which make the interest of the beneficiary much more valuable than the beneficiary believes it to be the trustee is under a duty to the beneficiary to inform him of such facts.
*240 It is urged that the action of the trustees in submitting the offer of purchase to the membership, without accurate information of the property's value, was a gross breach of duty. Webb & Knapp, Inc. v. Hanover Bank, 214 Md. 230, 133 A.2d 450 (1957), is cited in illustration of the point. In it the trustees of an estate attempted to sell a large tract of land near Washington, D.C. They published advertisements on the sale and named the price they expected to receive. The Court stated:
"... The discretion thus reposed in the trustees was not a mere arbitrary discretion, but a discretion coupled with a trust, and to be exercised solely for the benefit of the cestuis que trust. It was their duty, therefore, in making a sale of the property to act in a prudent and business-like manner, with a view to obtain as large a price as might, with due diligence and attention, be fairly and reasonably obtainable under the circumstances. In other words, to exercise that diligence and caution which a careful and prudent owner would observe in the sale of his own property. If the sale be made under circumstances of haste and imprudence, or if the trustees fail in reasonable diligence in inviting competition, or adopt an injudicious and disadvantageous mode of selling the property, a Court of Equity ought not ratify the sale... ." See, also, Callaway v. Hubner, 99 Md. 529, 58 A. 362. (214 Md. at 242-43, 133 A.2d at 456)
Present applicability of the case is entreated since the submission of the purchase proposal, including its price, carried with it the corresponding responsibility to exercise great diligence in determining that the amount was properly ascertained and was thus reasonable. By the appellants' words this was the key to everything that was to follow.
There is no doubt that the directors were trustees and that the duties of a fiduciary were imposed upon them. The major issue is whether there was a violation, or such violation, as would constitute an actual or constructive fraud in law.
The provisions of Section 77-5-237 authorize a majority of the members of the Association to sell the property and system belonging to it. The authorization is exclusive since it is not subject to ratification or confirmation by the board of directors or others. The question of fraud must then be determined upon the narrow basis of whether the trustees were required to submit the offer to the membership as presented to them, or whether they violated their trust by submitting it without further investigation of the amount offered. Inherent in the question is the fact that the offer of MP&L was neither solicited nor sought by the directors, but was made without their previous knowledge.
The contention is made initially that the trustees did not negotiate with MP&L and thus breached their duty. We find no evidence indicating negotiations with MP&L nor a request for the trustees to do so, but rather that the offer was submitted to the members as it was received. Additionally, the statute, as we view it, does not grant discretion to the trustees to withhold or to submit an offer of purchase dependent upon a price satisfactory to the trustees. We conclude they violated no fiduciary duty by not engaging in negotiations with MP&L for a higher price.
The offer of MP&L was for $10,500,000 plus an additional $1,500,000 for accounts receivable, cash on hand, etc., a total of $12,000,000, which was accompanied by a request that it be submitted to the members for a vote. It also contained guarantees of MP&L that it would work to the improvement of the economic development of the area, that it would maintain effective electrical service, and would protect all employees of the Association with no loss of pay, seniority or tenure. It is contended the trustees violated their duty because they had available information demonstrating the value of the system was *241 greater than the offer of MP&L and yet no inquiry was made concerning the amount, and the figure submitted to the members was deceptive because the trustees knew the "book value" was incorrect.
It is true that the book value of the assets of the Association was set forth in the literature distributed to the members and that no independent survey of the system's worth was conducted. The record reveals an offer of purchase was made in March 1969 by MP&L at which time an economist of great experience conducted a survey to determine whether or not the system should then be sold. The result of this survey, it is contended, was called to the attention of the trustees which showed the book value was incorrect inasmuch as there was then invested $2,500,000 (approximately) more in the plant system than was reflected by the records and a present projected system value of $4,000,000 (approximately) more than the replacement cost calculated from the records.
It is also urged that a study of the system was made by Patterson & Dewar, an engineering firm, which reflects from the business and financial analysis they prepared that the worth and prospects of the system to a business man were just "pure gold." Other items of value, it is maintained, were not considered by the trustees and not communicated to the members as the "Certificate of Public Convenience and Necessity" held by the Association, all in violation of their trust duties. The omission plus the submission of the book value of $7,500,000 was strenuously argued to be a fraud.
We think, however, there must be considered in conjunction with the argument relating to values the uncontradicted evidence that the Association's physical system at the time was inadequate, or soon would be, for the burgeoning area it served and also that it was dependent upon MP&L for its source of energy. The Association was thus confronted with a serious decision, not unusual in the utility business, of securing enormous loans to update its facilities to the demands of the day for electric energy or to raise its rates to the consumer, neither particularly palatable. The value must also be considered from the viewpoint of the improbability of others being interested in its purchase due to the nature of the business, its enormity, its dependence upon MP&L for its source of energy, all as considered from the eyes of the lay members not conversant with the intricacies of the utility business. The rate of return permitted by the Public Service Commission to MP&L must also be considered. This was based upon a book value of $7,500,000, the product of independent accountants, which could not be unilaterally adjusted upward by either the Association or MP&L. This was a major factor for consideration of the sale price because it would control the earning power of the prospective purchaser since the rates would be based thereon.
The merits of the proposed sale were the object of intense discussion by all levels of the local news media. Both proponents and opponents publicly voiced their views prior to the election. Letters from T.L. James, president of the Association, to the members urged their consideration of the proposition prior to making a decision. As mentioned, the fact of offer and the proposal were mailed to each of the members. The opinions of the experts valued the system from $7,500,000 to $30,500,000. When all of these factors are considered, we conclude, as we think we must, that the offer as made and accepted was not so inadequate, if at all, that it constituted a legal fraud. We, therefore, cannot state that the chancellor was manifestly wrong in his finding that the board of directors, as trustees, did not violate their fiduciary duties to the member-owners of the Association.
Assuming, but not deciding, that the monthly payment of $200 to each of the trustees for twelve years, if the sale was consummated, for their duties as an *242 advisory committee to MP&L was improper because it was withheld from the members, we, nevertheless, cannot determine this influenced the vote of the membership since the record is devoid of any evidence to that effect. Neither can we indulge the conjecture that the offer influenced the trustees to submit the proposal to the membership since the proposal was accompanied by a request for submission and since, by statute, the power of sale rested within that body. Moreover, the outcome of the suit must turn upon the evidence of the record. We conclude from it that the amount offered for the Association's system, as stated, and accepted by vote of its members, was adequate under the circumstances.
The foregoing conclusions are dependent upon the validity of the election to determine whether to sell or not to sell. The by-laws of the Association were amended on November 20, 1972, by the directors to authorize voting by proxy which is permitted by Section 77-5-227. See also Dixie Electric Power Ass'n v. Hosey, 208 So.2d 751 (Miss. 1968).
The minutes of the board of December 21 and 22, 1972, reflect that two separate and independent firms of certified public accountants were appointed to receive the proxies, conduct the balloting, count the ballots and certify the counts to the directors. Attached to the minutes was the official report of the executive committee of the results of the election. It shows that of a total membership of 15,773 there were 8,458 votes cast for the sale and 3,589 votes against. The meeting for the election was attended by no more than 250 members, the remaining votes cast being by proxy.
The by-laws of the Association state that either 5% of the total membership (789 members) or 1000 members, whichever is less, has to be present to constitute a quorum at a special meeting. Over 12,000 members cast their ballots, either by proxy or in person, on the proposed sale. The question develops of whether a quorum in a special meeting of the members can be constituted by both those present and those voting by proxy.
Section 77-5-223 permits the board of directors to "... make its own rules and regulations as to its procedure... ." In accord with this amendment the members voted individually and by proxy. The proxy voters were considered with those voting individually to compose a quorum. This is evidenced by the certification by the secretary of the board that over 1000 members were present, either in person or by proxy. There was no objection to the quorum statement at the time of the meeting. We conclude that a quorum may be constituted in an association, as it may be in other corporations, by both the members present and those voting by proxy. Duffy v. Lott, 17 Del. Ch. 376, 152 A. 849 (1930), is persuasive to this view, particularly since no cases are cited to the contrary. Indeed, this appears to be normal procedure in business corporations and is authorized by statute. Miss. Code Ann. § 79-3-61 (1972).
Moreover, we note that the appellants also engaged in gathering members' votes by proxy for the election. We conclude there was no irregularity in the quorum count and that it was sufficient to constitute a lawful meeting.
It is next contended that the appellants were unable to voice their opposition to the sale at the December 21 meeting, thereby invalidating it. The president called the meeting to order, the secretary certified a quorum was present, and then the board of directors departed the meeting hall. They returned only to insure that everyone present had an opportunity to vote. There is testimony they did not intend or permit the meeting to become a forum for public debate and discussion of MP&L's offer. From our review we cannot determine that this in any way impinged upon the election, denied a fair vote or an accurate count of the ballots cast. As mentioned, the issue had received much notoriety *243 via the news media, public discussion and debate, and doubtless lively private conversation as well. In our opinion the actions taken in no way prejudiced the appellants, but rather contributed to an efficient and orderly election.
We have reviewed in detail all other assignments of error, including the evidence offered by the complainants concerning an offer by MP&L to purchase in 1969 which was rejected by the trial court, and from our review and study we are of the opinion that they are without merit.
We conclude, as did the chancellor, that for whatever reason a majority of the members cast their votes in favor of the sale and we perceive no valid reason from the record why the majority's wishes should be overturned.
Affirmed.
RODGERS, P.J., and SMITH, WALKER and BROOM, JJ., concur.
GILLESPIE, C.J., and ROBERTSON, J., took no part.