370 So.2d 909 (1979)
O.J. STANTON AND COMPANY, INC.
v.
MISSISSIPPI STATE HIGHWAY COMMISSION.
No. 50821.
Supreme Court of Mississippi.
April 11, 1979.
Rehearing Denied May 30, 1979.
*910 Young, Scanlon & Sessums, Pat H. Scanlon, Jackson, Harry L. Griffin, Jr., Atlanta, Ga., Reynolds & Mockbee, David L. Reynolds, Jackson, for appellant.
Butler, Snow, O'Mara, Stevens & Cannada, Rhesa H. Barksdale, Stephen W. Rosenblatt, Lawrence J. Franck, Frank E. Shanahan, Jr., Jackson, for appellee.
Before SMITH, SUGG and COFER, JJ.
COFER, Justice, for the Court:
Appellant, O.J. Stanton and Company, Incorporated (Stanton), appealed this cause from an adverse decision of the Chancery Court of the First Judicial District of Hinds County. Appellee, Mississippi State Highway Commission (Commission), defendant in the lower court, took a cross appeal from a measure of relief decreed in favor of Stanton.
In the latter 1960's Stanton, a substantial road construction contractor, contracted with the Commission for construction work on Mississippi highways. These contracts ran at least in figures upward of eight million dollars. To carry out its undertakings under these contracts, it necessarily had many employees and multiple scores of road building machines.
There are eight projects involved in this suit, included in five divisions, which are here loosely identified as follows:
(1) One involving highway work in Sharkey County, frequently herein called "Sharkey."
(2) One for a segment of Interstate Highway I-55, in Holmes County, called "Big Holmes."
(3) One on Highway 49 in Holmes County, called "Little Holmes."
(4) Four projects involving the intersection, and highway areas contiguous to the intersection, of Highways 45 and 82 at Columbus, all condensed into one transaction and known as "Lowndes."
(5) One involving Highway 61 in Warren County, referred to as "Warren."
[We know also from O.J. Stanton and Company, Incorporated v. Dennis, 360 So.2d 669 (Miss. 1978), that Stanton, during at least a part of the time contracted in the projects above, had a road contract with the Commission which it was carrying out in Marion County and also a contract under performance with the United States Government for road work in Vicksburg National Military Park.]
Variances arose between Stanton and personnel of the Commission which resulted *911 in this suit by Stanton wherein damages were sought on each of the five projects mentioned above, totaling $606,297.90. Generally, and without detailing the particular grounds for relief in each of the five projects, Stanton alleged breach of contract through delays purposely or incidentally caused in the carrying out of the contracts, and through extra work forced upon it by the Commission's decisions, allegedly sometimes impetuously or arbitrarily or capriciously made, as to the manner of Stanton's performance of its work.
The suit was begun October 23, 1973, and involving the accumulation of twenty volumes and 2,949 pages of record and hundreds of exhibits, the Court's final decree was entered on September 9, 1977.
It was heard, in fragments as shown below, over a long period of time, and the painstaking attention and patience on the part of the court and the attorneys are commendable.
By agreement of the parties and the court, each of the five projects was to be heard and was heard first on the issue of liability on the Commission's part and then, if liability was established, there would be a hearing on the amount of damages. Liability hearings were had on all five projects. At the conclusion of Stanton's proof in Sharkey, Big Holmes, Little Holmes, and Lowndes, motion by the Commission to exclude and dismiss on all phases of each of these projects was sustained, and therefore, the issue of damages was never reached in them.
In Warren, the Court did find that a case for relief by Stanton had been made and a hearing on the question of damages was reached, resulting in a money decree for Stanton.
In some of the liability hearings, Stanton called Commission officers as adverse witnesses, and while their testimony will nowhere herein be detailed, the fact and effect of their use will be noticed. Stanton bound itself by that part of the adverse witnesses' testimony not contradicted by Stanton, but it was not bound by that part it rebutted. Vinson v. Glenn, 338 So.2d 385, 387 (Miss. 1976).
Two other familiar legal principles will be noticed now.
Sharkey, Big Holmes, Little Holmes, and Lowndes were dismissed at the conclusion of Stanton's case on liability. Judge Griffith, in his Mississippi Chancery Practice, § 584, page 615 (2d ed. 1950), sets out the rule as to motions to exclude and dismiss at the conclusion of a party's proof:
... when at the conclusion of complainant's evidence the defendant moves to exclude it and to dismiss the bill the court should assume as true all facts which the complainant's evidence fairly tended to establish together with all reasonable inferences to be deduced therefrom, the practice in that respect in the chancery court being analogous to that in the circuit court.
In Paymaster Oil Mill Company v. Mitchell, 319 So.2d 652, 655 (Miss. 1975), it is said:
We have held many times that in passing on a motion for a directed verdict the court must look only to the testimony adduced for the plaintiff and accord truthfulness to it and indulge all favorable inferences that could be drawn therefrom, and if either is sufficient to support a verdict, then the motion for a directed verdict should be overruled . ..
Warren was decided by the chancellor when all the proof had been adduced for both parties in the liability and damages hearings. Under these circumstances, the decision must be upheld unless it is found to be contrary to the weight of the evidence, or, as sometimes said, is manifestly wrong. McNair v. Capital Electric Power Association, 324 So.2d 234 (Miss. 1975); Brent v. Cox, 246 So.2d 552 (Miss. 1971).
During the pertinent contracting periods there were two compilations, Mississippi Standard Specifications for Road and Bridge Construction 1956 edition, and its 1967 edition, and one or the other of these editions, depending upon the contract date, was by reference made a part of each of the *912 contracts of the parties and was as binding on them as any other provision of such contract.
With these general preliminary observations, we approach the issues.

I. SHARKEY
Stanton asserted that Commission caused delays and disruptions in the performance by Stanton of its contract; in requiring undue excavation depth for a culvert at Station 125 and in not paying contract price for that excavation and for other culverts included in the contract; in requiring backfill density tests at unreasonable levels; in requiring unnecessary inspections causing extra work; and that Commission made costly errors in structural excavation for which Stanton was entitled to pay but for which it was not compensated.
An examination of the testimony for Stanton taken most favorable for it, reflects that Stanton made out a prima facie case as to the culvert excavation it did other than at Station 125 and this means that the Commission should have been required to put on its proof as to this culvert excavation in answer to Stanton's prima facie case.
In all other respects, Stanton failed to make out a prima facie case as to the Sharkey project, as the court correctly found.

II. BIG HOLMES
This project involved work on Interstate I-55 in the general Goodman-Durant area, and Stanton claims it was damaged by the slowdowns caused by compaction and density tests, the Commission's demands that culvert pipe be laid and embedded according to the applicable specifications; the Commission's departure from a planned sequence for the work of the contract at one stage by requiring all work to be first completed on a two-mile segment, and by Commission's withholding of liquidated damages for Stanton's failure to complete the contract in timely manner. There is long testimony about the number and manner of the density tests to determine if the earth had been properly compacted. Much complaint is voiced as to the laying of the pipe, but the requirement that it be laid as exacted by the Commission is strictly in accordance with § 603.04 of the 1967 Standard Specifications, made a part of the contract.
We find no prima facie case in favor of the claim as to the density tests and the pipe embedding.
Contrary to the sequence schedule submitted to, and approved by, the Commission, the Commission, at one point, required all work to cease elsewhere on the almost thirteen-mile span of the contract, until work was completed on the two miles of the project next south of highway 14. Owing to this requirement the work was greatly slowed down and Stanton was damaged thereby. Liquidated damages in the amount of $34,440 were withheld by the Commission, which, if caused by the restriction of area of in-grade work as noted first hereinabove, should have responding proof from the Commission.
We conclude that, in the in-grade preparation and the liquidated damages, Stanton produced a prima facie case.

III. LITTLE HOLMES
Stanton's complaint here is that, when its begin-work order came, there were located in the area of the work one power pole and a guy wire supporting another pole, and that these should have been removed before it was ordered to advance. The record establishes that an understanding had been arrived at between the owner of the power line and the Commission for the owner's removal of these. In the Commission's start-work directive, note was taken of the presence of these, and the Commission requested that Stanton begin at the north end of the project and work south with the expectation that these obstacles would be removed before they became a hindrance. In spite of maintaining (1) that it was the feasible thing to carry the whole project on at one time, and (2) that it was delayed until the pole and guy wire were removed, the record establishes that Stanton never began work until September *913 2, 1969, although the obstacles had been removed on July 29, 1969, and actually started its work at the north end of the project.
Taking the testimony and inferences therefrom most strongly in favor of Stanton, it did not make a prima facie case as to Little Holmes.

IV. LOWNDES
As hereinabove early noticed the Lowndes project included four different projects conveniently combined into one in the pleadings and the proof.
Stanton claims damage because of the asserted facts that in the bid documents setting forth the dirt removal details, its source, and where to be carried, there appeared a statement "20 percent shrinkage factor used." The earth actually was Selma chalk which swelled when excavated and delivered to the site requiring less volume of hauling, and involved extra work in loosening for excavation and in compacting it to density when delivered. Stanton maintains that the shrinkage factor asserted was a representation or perhaps rather a misrepresentation intended to have the bidder's reliance upon it, and that the difference was expensive to Stanton. The Commission countered with the assertion that 20% shrinkage was only a figure assumed for its purpose in comparing bids.
The record further reveals that Stanton had done other work in the Columbus area, was familiar with this type of soil and did some test examination of it. In addition, according to the specifications applicable thereto, it was the duty of the bidder to make his own determination as to what to expect from the dirt. Stanton says, in its reply brief, "a contractor bids a project based on his knowledge of the contract and the project at the time he submits his offer to the owner."
We think that Stanton established no case for relief as to the shrinkage issue.
Stanton next complains that it was damaged on account of the failure of one of the spans of the Highway 82 bridge crossing the Tombigbee River.
Before bidding on the project, Stanton, through an association apparently existing to be of service to road builders, obtained assurance from the Commission that load limits crossing the Tombigbee River and other bridges involved would be relaxed, and Stanton took this agreement into consideration as vitally affecting the number of loads of earth that would have to be transported. One span of the Tombigbee River Bridge, made of light-weight concrete, cracked and then holes developed in it.
This occurrence brought about a conference between Stanton and the Commission which gave rise to a supplemental agreement whereby, among other things, Stanton would repair the damage and the cost would be equitably divided between the parties. About, but before, this time, the Commission had withdrawn the relaxation of load limits and, for the rest of the hauling, Stanton was limited to much lighter loads across the bridges involved. It claims damage because of that fact.
The record shows, however, that 90 to 95% of the hauling across these bridges had been done before this bridge span flaw developed, and that a subcontractor or hauler employee had quit the job and Stanton had sued him asserting that 50% of the delay was caused by his breach of contract. The record also has it that, before this time, Stanton had already removed much of his heavy hauling machinery to another project. Stanton then subcontracted the hauling to another contractor, whose vehicles were of much lower capacity.
The supplemental agreement we have above mentioned provides "that the hauling of materials across the bridge at legal loads and at a speed reduced to a maximum of 15 miles per hour has been authorized since assessment of the damage, and this authorization is to continue and this hauling and all other work of our contract is to be completed at the earliest possible time. ..." (Emphasis added and later herein we will take further note of the underscored portion.)
*914 Taken at its strongest in favor of Stanton, no prima facie case for relief as to the bridge hindrance has been shown.
Stanton next complains of slow-up and delay in its work because of interference by the Commission with its planned sequence of accomplishing the work of the project.
Returning for a moment to Big Holmes, the record shows that, when the project engineer brought information to Stanton that it would be required to do the project as discussed above, one of the Stantons making up the corporate complainant observed that such a requirement had not been made for the Lowndes project. Stanton claims that promptly the Commission required all work to cease until a 9/10 mile segment of the Lowndes project had had soil erosion and grassing treatment. This left much of Stanton's equipment idle and occasioned considerable delay on its part.
Stanton and the Commission are at variance as to liquidated damages imposed for failure to complete the project on time.
Some of the pay estimates in evidence show 300 contract working days and have below "(+ 26) C.O. # 1". The final estimate returns to 300 days, however, and it is apparent that liquidated damages were withheld on that basis. Stanton claims it is entitled to the 26 extra days plus seven days' delay in the in-grade preparation work noticed next above and fourteen days of interruption on account of the bridge failure.
Taking the proof as to the in-grade above, we are of the view that it called for proof in answer by the Commission.
In view of what has been said as to the liquidated damages, we think the Commission should come forward with its proof and also that determination is called for as to whether the supplemental contract portion emphasized above, operates to abandon maximum working days and is a new and superseding agreement that the contract "is to be completed at the earliest possible time."

V. WARREN
We have examined the testimony on the liability hearing and the damages hearing. Stanton claimed its work was delayed substantially by faulty plans and specifications and erroneous calculations of materials, and prayed money damages for its equipment which stood idle during these delays, and also for cost of overhead office expenses, attributable to these delays, and for interest on all of the same. Liquidated damages had been assessed and withheld by the Commission and Stanton prayed recovery thereof. We do not undertake detailed review thereof at this point, but are of the opinion that, in what the chancellor allowed and in what he declined to allow, he is substantially supported in the record, and is not at all manifestly wrong. He required remission of $9,200 of liquidated damages plus $3,708.23 of interest thereon to June 17, 1977, a total of $12,908.23, and denied other relief prayed by Stanton. The chancellor is affirmed on both direct and cross appeal.

SUMMARY
In recapitulation, we have held that Stanton made out a prima facie case and the cause will be reversed and remanded in the following:
1. Sharkey, in dirt excavation for all culverts complained of, other than that at Station 125.
2. Big Holmes, in the in-grade preparation and in the liquidated damages.
3. Little Holmes, none.
4. Lowndes, in the in-grade preparation and in the liquidated damages.
5. Warren, we have affirmed the chancellor entirely.
In Stanton's second assignment of error, it is asserted that the Court erred in sustaining the Commission's objections to evidence offered by Stanton to prove (1) Stanton's prior course of dealings with the Commission; (2) the Commission's usage and custom in interpreting the contracts and specifications; (3) the Commission's interpretation *915 of the same standard specifications on other projects; and (4) Stanton's exhibits which were marked for identification.
At the threshold of this assignment is the legal principle that "The law of usage and custom and the courts cannot make contracts for parties," although for explanation or clarification of provisions ambiguous and requiring interpretation, custom may be read into contracts. Fireman's Fund Insurance Co. v. Williams, 170 Miss. 199, 211, 154 So. 545, 547 (1934).
In Magnolia Lumber Corporation, Inc. v. Czerwiec Lumber Co., Inc., 207 Miss. 738, 747, 43 So.2d 204, 206 (1949), it is said, "Since there was a lawful and valid contract between appellant and appellee we are of the opinion that the proffered evidence of custom and usage was properly excluded when the verdict of the jury was set aside by the trial court."
Stanton cites, with emphasis, the use of the words "at the earliest practicable time" in Standard Specifications, 1967 edition, § 323.02, as being ambiguous. Taken alone, and out of context the words' meaning is subject to several explanations. In context, it is fully explained, as we read it.
Each of the contracts in evidence is a stupendous document with many patent enigmas for the layman, but as noticed hereinabove Stanton has said that a contractor bids on his knowledge of the contract and the project, and it seems well within reason to conclude that Stanton had a good working knowledge of each of these contracts after successful and apparently harmonious completion of scores of similar contracts with the Commission before the late 1960's.
We dispose of this assignment of error by stating that, in the further proceedings involved in our remand of this case, ambiguities in the contracts may be explained by custom and usage, as clearly provided by law, but the record should not be cluttered and prolonged by time-consuming proof as to how other contracts were treated simply because of a desire by either party to accomplish a part of any contract in a manner more suitable or convenient to such party. The parties should also accommodate themselves to the fact that custom and usage may not prevail over the contract's provisions  "when its place [usage and custom] is occupied by particular stipulations." Burbridge & Houston v. S. Gumbel & Co., 72 Miss. 371, 378, 16 So. 792, 793 (1895).
The costs of the appeal will be assessed equally to the parties.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, LEE and BOWLING, JJ., concur.