812 So.2d 980 (2002)
In the Matter of ADOPTION: C.L.B.
v.
D.G.B., V.G.B. and M.B.
No. 2000-CA-00213-SCT.
Supreme Court of Mississippi.
April 4, 2002.
*981 T. Jackson Lyons, Jackson, attorney for appellant.
Ottis B. Crocker, III, Bruce, attorney for appellees.
EN BANC.
PITTMAN, C.J., for the Court.
¶ 1. C.L.B. is the natural mother of V.C.M.B., a minor child born on November 1, 1997. Along with M.B., the natural father, C.L.B. arranged for and consented to the adoption of V.C.M.B. by the paternal grandparents, D.G.B. and V.G.B. A final judgment of adoption was entered on February 9, 1998, in the Pearl River County Chancery Court. On May 14, 1998, the natural mother filed a Petition to Set Aside the Final Judgment of Adoption. In attempting to have the adoption set aside, C.L.B. alleged that she suffered from postpartum depression at the time she consented to the adoption, that she had been isolated and could not receive counsel from friends and family, and that she had been taken advantage of by her in-laws, with whom she had developed a close relationship. Furthermore, she argued that the adoption proceedings were void for failure to appoint a guardian ad litem and for failure to comply with the provisions of the Uniform Child Custody Jurisdiction Act (UCCJA), Miss.Code Ann. §§ 93-23-1 to -47 (1994). On September 2 and September 20, 1999, a hearing was held on the matter. The chancellor entered a final order on October 18, 1999, holding that the natural mother had not presented evidence justifying the revocation of the adoption. C.L.B. subsequently moved for a judgment notwithstanding the verdict or, in the alternative, a new trial. On January 26, 2000, the chancellor denied the motion and held that the UCCJA was not applicable to adoption proceedings. C.L.B. filed a timely appeal alleging that the chancellor erred by (1) not applying the UCCJA's requirements to the present case as it is a custody matter, (2) failing to appoint a guardian ad litem during the adoption proceedings, and (3) not properly considering her age, education, and mental state. As such, C.L.B. *982 argues that the adoption should be set aside.

FACTS
¶ 2. M.B. and C.L.B. met and began dating while both were still in high school. Sometime in March 1997, C.L.B. learned that she was pregnant. She subsequently told M.B., and the two decided to get married. After eloping on June 2, 1997, the couple lived with M.B.'s parents for approximately three months while building a house behind D.G.B. and V.G.B.'s home. As the house neared completion, the young couple took up residence there.
¶ 3. During the pregnancy, C.L.B. developed a close relationship with her in-laws; she began calling the couple "dad" and "mom." D.G.B. and V.G.B. took care of C.L.B. as she did not work and M.B. was often away on construction jobs. The young couple never paid rent, and Medicaid paid the medical expenses.
¶ 4. On November 21, 1997, V.C.M.B. was born. Since the young parents' home was not yet completed, the child stayed with her paternal grandparents upon her release from the hospital. Shortly after giving birth, C.L.B. became ill and was admitted to Forrest General Hospital. While C.L.B. was hospitalized, V.C.M.B. remained in the care of the paternal grandparents.
¶ 5. In December 1997, C.L.B. attempted suicide. The attempt led to a stay at Forrest General's mental health facility, Pine Grove. During her stay and shortly thereafter, C.L.B. related memories of physical and sexual abuse by her father and grandmother, which she now denies. C.L.B. was treated and diagnosed for major depression, prescribed Prozac, and discharged on December 16, 1997. V.C.M.B. remained in the care of her paternal grandparents during the natural mother's absence.
¶ 6. In January 1998, C.L.B. contacted Deborah Avery (Avery), an attorney, to establish some form of guardianship for V.C.M.B. with the paternal grandparents. Subsequently, Avery met with C.L.B., M.B., and V.G.B. and asked about their objectives for guardianship. The natural mother indicated that she did not feel she could raise V.C.M.B. and desired to restrict the child's contact with the maternal grandparents. At that point, Avery asked whether adoption had been considered. After discussion of the topic, Avery prepared the necessary paperwork, and the natural mother took it with her. On February 2, 1998, an adoption petition and natural parents' surrender forms were duly filed, and a final judgment of adoption was entered on February 9, 1998.
¶ 7. Over the next few months, M.B. and C.L.B. separated. He moved in with another woman, and C.L.B. remained in the unfinished house until March, when she moved back into her parents' home. She has not attempted to visit V.C.M.B. since leaving her in-laws' property. Finally, on May 14, 1998, C.L.B. unsuccessfully moved to set aside the adoption, resulting in this appeal.

DISCUSSION
¶ 8. Section 93-17-17 states that "no adoption proceedings shall be permitted to be set aside except for jurisdictional defects and for failure to file and prosecute the same under the provisions of this chapter." Miss.Code Ann. § 93-17-17 (1994). In addition, whenever reviewing adoption proceedings, we must always remember that the best interests of the child are paramount. Martin v. Putnam, 427 So.2d 1373, 1377 (Miss.1983). With that in mind, we turn to the issues before us.

I. WHETHER THE CHANCELLOR ERRED BY NOT REQUIRING *983 THE APPELLEES TO ABIDE BY THE PROVISIONS OF THE UNIFORM CHILD CUSTODY JURISDICTION ACT.
¶ 9. The natural mother contends that the adoption should be set aside for failure to comply with the requirements of the UCCJA, namely that a residency affidavit was not included with the petition for adoption. Since we have yet to hold whether adoptions are subject to the provisions of the UCCJA, this matter is an issue of first impression.
¶ 10. C.L.B. argues that adoptions are "custody proceedings" within the meaning of the UCCJA and, therefore, subject to its provisions. Under Miss.Code Ann. § 93-23-3(d) (1994), a custody proceeding includes "proceedings in which a custody determination is one of several issues, such as an action for divorce or separation, and includes child neglect and dependency proceedings." Glaringly absent is the specific inclusion of adoptions. Therefore, before we can determine whether the adoption petition was in compliance with the UCCJA provisions, we must first determine whether the UCCJA applies to adoptions.
¶ 11. C.L.B.'s argument is that an adoption is the most obvious form of a custody proceeding since it is the final determination of whom has care, control and maintenance over a child. Black's Law Dictionary 384 (6th ed.1990). In addition, she views the UCCJA definition as being inclusive rather than exclusive, thereby encompassing more classes of cases than those specifically listed. Furthermore, several jurisdictions throughout the nation have ruled upon this same issue and decided that UCCJA, or similar statutes, do cover adoption proceedings. See Gainey v. Olivo, 258 Ga. 640, 373 S.E.2d 4 (1988). Accord, In re Adoption of Baby Girl B, 19 Kan.App.2d 283, 867 P.2d 1074 (1994); Foster v. Stein, 183 Mich.App. 424, 454 N.W.2d 244 (1990); In re Steven C., 169 Wis.2d 727, 486 N.W.2d 572 (1992). As such, the natural mother wishes us to follow the example of these jurisdictions and apply the UCCJA to the present adoption proceeding.
¶ 12. However, there are other jurisdictions who have also examined this issue and have ruled that adoptions do not come under the UCCJA. See Williams v. Knott, 690 S.W.2d 605 (Tex.Ct.App.1985). In addition, all of the cases cited by the natural mother involved custody determinations arising out of divorce or non-consensual adoptions where not all of the interested parties were present. Therefore, those cases were not merely matters of adoption; they also struggled with true custody issues. It is important to note that adoptions were unknown to the common law and exist solely by statute. Eggleston v. Landrum, 210 Miss. 645, 651-52, 50 So.2d 364, 366 (1951). As such, statutes control the manner in which adoptions are conducted, and there is a specific chapter set out in the Mississippi Code which governs and controls adoption proceedings. Subjecting consensual adoptions to the requirements of multiple statutes would only confuse and frustrate the process. In addition, public policy demands that we not subject consensual adoptions to this additional set of requirements. A virtual floodgate of late jurisdictional challenges would open, releasing a deluge of cases on our court system and uncertainty into the home of every adoptive parent. As such, we hold that consensual adoptions in which all interested parties are present are not subject to the provisions of the UCCJA.

II. WHETHER THE CHANCELLOR ERRED BY FAILING TO ADOPT A GUARDIAN AD LITEM DURING THE ADOPTION PROCEEDING.
*984 ¶ 13. The natural mother also argues that since adoption is essentially a termination of parental rights, the appointment of a guardian ad litem is mandatory per Miss.Code Ann. § 93-15-103 (Supp. 2001). The chancellor stated in his judgment, "the Court finds this case to be one of parental termination and not one of custody...." The failure to appoint a guardian ad litem, C.L.B. contends, is grounds to set aside the adoption because the best interests of the child were not being guarded. As with the UCCJA, C.L.B. misinterprets the law.
¶ 14. Nowhere within the statutory adoption scheme can a mandate requiring the appointment of a guardian ad litem in situations like the present case be found. As we have previously held, "the more specific statute controlling this case is § 93-17-8(5). That statute limits the occasions where the appointment of a guardian ad litem is required in an adoption proceeding to contested allegations and where an adoption agency is involved. Neither of those scenarios is present here." J.C. v. R.Y., 797 So.2d 209, 215 (Miss.2001). Furthermore, the Court of Appeals has expressly stated, and we agree, that "Mississippi law does not require the chancellor to appoint a guardian ad litem." In re Adoption of D.T.H., 748 So.2d 853, 856 (Miss.Ct.App.1999). This is especially true for cases similar to the present matter where valid consent and surrender forms were executed by both natural parents. Also, a full reading of the parental termination statute clearly indicates that it is to be applied in cases in which one party or the court is trying to terminate the parental rights of another, not cases of consensual adoption where both natural parents agree to and are party to the adoption petition. Miss.Code Ann. § 93-15-103. This issue is without merit.

III. WHETHER THE CHANCELLOR ERRED IN NOT FULLY CONSIDERING C.L.B.'S MENTAL STATE AT THE TIME OF THE ADOPTION.
¶ 15. Finally, the natural mother contends that the circumstances of her life at the time of the adoption are illustrative of duress and subjected her to the undue influence of her husband and in-laws. We have held that,
Absent a showing by the parent(s) establishing either fraud, duress, or undue influence by clear and convincing evidence, surrenders executed in strict compliance with the safeguard provision of § 93-17-9, supra, are irrevocable....The statutory safeguards are themselves sufficient to guard against a hastily made decision.
Grafe v. Olds, 556 So.2d 690, 694 (Miss. 1990). We have also held "there is no presumption that a party has exercised undue influence upon another." In re Adoption of M.D.T., 722 So.2d 702, 705 (Miss.1998) (citing C.C.I. v. Natural Parents, 398 So.2d 220 (Miss.1981)). However, "[r]evocability of the surrender of a child and consent for another to adopt a child is not to be decided upon rigid or technical rules. Such a decision must be made upon sound judicial discretion." Grafe, 556 So.2d at 694.
¶ 16. After careful review of the record, it is this Court's determination that the chancellor was adequately informed prior to final judgment of adoption that the natural mother had recently suffered psychological difficulties. The record indicates that the chancellor heard extensive testimony regarding C.L.B.'s mental state at the time surrounding her consent. For example, the record contains testimony that C.L.B. was never diagnosed with postpartum depression, and that at the time she was released from the hospital she was *985 "cured," and "didn't have any problems." C.L.B. acknowledged that three days after being admitted to the hospital, a social worker evaluated her as having "good coping skills," "good decision-making ability," and "emotional, appropriate cognitive status and no learning barriers." Further, the record clearly shows that the chancellor was informed about C.L.B.'s admission to the Pine Grove psychiatric unit prior to consenting to the adoption.
¶ 17. To remand this case would exhibit disregard for our well-settled standard of review:
This Court will reverse a chancellor only when he is manifestly wrong. Hans v. Hans, 482 So.2d 1117, 1119 (Miss.1986); Duane v. Saltaformaggio, 455 So.2d 753, 757 (Miss.1984). A chancellor's findings will not be disturbed unless he was manifestly wrong, clearly erroneous or an erroneous legal standard was applied. Tinnin v. First United Bank of Miss., 570 So.2d 1193, 1194 (Miss.1990); Bell v. Parker, 563 So.2d 594, 596-97 (Miss. 1990). Where there is substantial evidence to support his findings, this Court is without the authority to disturb his conclusions, although it might have found otherwise as an original matter. In re Estate of Harris, 539 So.2d 1040, 1043 (Miss.1989). Additionally, where the chancellor has made no specific findings, we will proceed on the assumption that he resolved all such fact issues in favor of the appellee. Newsom v. Newsom, 557 So.2d 511, 514 (Miss.1990). The chancellor's decision must be upheld unless it is found to be contrary to the weight of the evidence or if it is manifestly wrong. O.J. Stanton & Co. v. Mississippi State Highway Comm'n, 370 So.2d 909, 911 (Miss.1979).
In re Estate of Johnson, 735 So.2d 231, 236 (Miss.1999) (emphasis added). In his ruling, the chancellor stated that he had "heard no testimony that leads [him] to believe that [C.L.B.] didn't know what she was doing and didn't do what she wanted to do on the day she signed the consent, and I think that's what it's about for the sake of the child." This Court must presume that the chancellor fully considered the testimony regarding C.L.B.'s mental state, and found her to be capable of consenting to the adoption. This issue is without merit.

CONCLUSION
¶ 18. Consensual adoptions where all parties are present do not fall within the meaning of a custody proceeding as envisioned by the UCCJA. In addition, chancellors are not required to appoint a guardian ad litem in adoption cases, especially those with valid consent and surrender forms. Finally, the record shows that the chancellor was adequately informed prior to final judgment of adoption that the natural mother had recently suffered psychological difficulties. Accordingly, the judgment of the Pearl River County Chancery Court is affirmed.
¶ 19. AFFIRMED.
SMITH, P.J., WALLER, COBB, EASLEY, CARLSON AND GRAVES, JJ., CONCUR. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION. DIAZ, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McRAE, P.J.
McRAE, P.J., dissenting.
¶ 20. This case cries out for closer review, particularly in light of the fact that it concerns the mental state of a minor. C.L.B., when under the age of 18, became pregnant out of wedlock, married the child's father, had the child, was depressed (post partum), attempted suicide and realized *986 she had been the victim of child abuse all just prior to making the decision to give her child up for adoption. The record indicates that the only testimony the chancellor heard as to the mental state of C.L.B. came from a social worker. The social worker's opinions do not qualify as expert opinions as those of a mental health expert (e.g. psychiatrist, psychologist) would.
¶ 21. As C.L.B. correctly argues, a guardian ad litem should have been appointed to represent the interests of her child. Although the majority is correct in saying that the appointment of a guardian ad litem is not required in a case like this where both parents voluntarily give up their parental rights, this is not to say that they are correct in not requiring said guardian for the child. The age of the mother and her mental state point to the obvious conclusion that she might not know what would be in the best interest of the child. Since the best interest of the child is the "polestar" consideration in matters of this nature, a guardian ad litem should have been appointed for the child. Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983).
¶ 22. I also disagree with the majority's decision not to require the parties to abide by the Uniform Child Custody Jurisdiction Act (UCCJA). The majority of jurisdictions within the United States have applied the UCCJA to adoptions as the "effect of a final decree of adoption is to terminate all legal rights between the adopted child and the child's relatives.... In order to prevent by adoption that which cannot be achieved by custody proceedings, the provisions of the Uniform Act must also be applied to adoption proceedings." In re Adoption of B.E.W.G., 379 Pa.Super. 264, 549 A.2d 1286, 1290 (1988). See also Souza v. Superior Court of Santa Cruz, 193 Cal.App.3d 1304, 238 Cal.Rptr. 892 (1987); Gainey v. Olivo, 258 Ga. 640, 373 S.E.2d 4 (1988); Slidell v. Valentine, 298 N.W.2d 599 (Iowa 1980); In re Clausen, 442 Mich. 648, 502 N.W.2d 649 (1993); E.E.B. v. D.A., 89 N.J. 595, 446 A.2d 871 (1982); In re Adoption of Asente, 90 Ohio St.3d 91, 734 N.E.2d 1224 (2000); In re Steven C., 169 Wis.2d 727, 486 N.W.2d 572 (1992). This Court should follow these other jurisdictions and apply the UCCJA to adoption proceedings.
¶ 23. Proper consideration was not given to important factors, including the lack of a guardian ad litem for the child, and the UCCJA should have been applied in this case. In light of these factors, the case should be reversed and remanded for proper consideration by the trial court.
DIAZ, J., dissenting.
¶ 24. The majority finds that the chancellor sufficiently considered C.L.B.'s mental state at the time of the adoption and did not commit a clear error of judgment in affirming the adoption. Because I would find that the chancellor did not fully consider C.L.B.'s mental state at the time of the adoption, I respectfully dissent.
¶ 25. The facts of this case are troubling. C.L.B. was obviously suffering from a flawed mental state after the birth of her child. She had lost contact with her own family and friends and lived with and depended upon her in-laws. Evidence of C.L.B.'s psychological problems began only a few weeks after the birth when she attempted suicide. At that point, C.L.B. was diagnosed with depression and prescribed the drug Prozac. Mere weeks after the suicide attempt, C.L.B. approached an attorney, Deborah Avery. C.L.B. informed Avery of the alleged abuse she suffered at the hands of her father and grandmother and asked Avery to find a way to prevent her child from ever having contact with those relatives. Avery recommended *987 adoption. Avery treated C.L.B.'s flawed mental state and unusually close relationship with her relatives as a non-issue. Avery, acting as legal counsel for all parties, did not even investigate the matter, nor inform the chancellor prior to final judgment of adoption that the natural mother had recently suffered psychological difficulties.
¶ 26. The lack of consideration given to the matter was improper. C.L.B. put forth evidence of her mental state at the time, but the chancellor failed to fully consider it. I believe this to be reversible error and would reverse the judgment and remand the case for further consideration.
McRAE, P.J., JOINS THIS OPINION.